Jefferson **HILL, Tom Roberts, Paul Marshall, Thomas Schaal, Jr., Charles Vogel, John Greer, Claire Janssen, Daniel Haug, Matthew Montgomery, James Fritcher, Sara Gordon, Don Little, Jr., Greg Wattson, Jeffery Dickerson, Randy Ackerman, and Jeff Roberts, Plaintiffs,**

v.

**OPUS CORPORATION, a Minnesota corporation, Gerald Rauenhorst T982 Irrevocable Trust f/b/o Grandchildren, Gerald Rauenhorst 1982 Irrevocable Trust f/b/o Children, Keith Bednarowski, an individual, Luz Campa, an individual, Mark Rauenhorst, an individual, and Does 1 through 100, inclusive, Defendants.**

**Case No. CV 10–04806 MMM (VBKx).**

United States District Court,
C.D. California.

Nov. 14, 2011.

Charles E. Hill, Greg K. Hafif, Michael G. Dawson, Law Offices of Herbert Hafif APC, Claremont, CA, for Plaintiffs.

Dennis M. Ryan, John B. Gordon, Peter J. Goss, Woodrow T. Roberts, III, Faegre & Benson LLP, Minneapolis, MN, James Oliva, David F. McDowell, Morrison & Foerster LLP, Los Angeles, CA, for Defendants.

ORDER GRANTING DEFENDANTS' MOTION TO DISMISS PLAIN-TIFFS' STATE LAW CLAIMS AND RICO CLAIMS

MARGARET M. MORROW, District Judge.

On June 29, 2010, Randy Ackerman, Jeffrey Dickerson, James Fritcher, Sara Gordon, John Greer, Daniel Haug, Jefferson Hill, Claire Janssen, Don Little, Jr., Paul

Marshall, Matthew Montgomery, Jeff Roberts, Tom Roberts, Thomas Schaal, Jr., Charles Vogel, and Greg Wattson filed this action against Keith Bednarowski, Luz Campa, Mark Rauenhorst, Gerald Rauenhorst 1982 Irrevocable Trust F/B/O Children ("the Children Trust"), Gerald Rauenhorst 1982 Irrevocable Trust F/B/O Grandchildren ("the Grandchildren Trust"), and Opus Corporation.[1] Plaintiffs allege that they are owed compensation and deferred compensation by their former employer, Opus West Corporation ("Opus West"). They assert that defendants caused Opus West to transfer monies to its parent company, Opus Corporation,[2] which led Opus West to fail and seek Chapter 11 bankruptcy protection. On July 11, 2011, plaintiffs filed a first amended complaint.[3] On August 5, 2011, defendants filed a motion to dismiss plaintiffs' Racketeer Influenced and Corrupt Organizations Act ("RICO") claim, as well as their state law claims to the extent they are based on ERISA-covered benefit plans.[4] Defendants also filed a request for judicial notice in support of their motion.[5] On September 12, 2011, plaintiffs opposed the motion on September 12, 2011,[6] and defendants filed a reply on October 7, 2011.[7]

## I. FACTUAL BACKGROUND

Plaintiffs are former employees of Opus West, a real estate development corporation headquartered in Phoenix, Arizona.[8] Hill, Marshall, Schaal, Montgomery, Little, Wattson, Dickerson, and Ackerman (the "California plaintiffs") are California residents, while T. Roberts, J. Roberts, Vogel, Greer, Janssen, Haug, Fritcher, and Gordon ("the Arizona plaintiffs") are Arizona residents.[9] The California plaintiffs worked for Opus West for an unspecified period of time.[10] They allege that they entered into an employment relationship with the company in California and worked for it in the state.[11] The Arizona plaintiffs were employed in Opus West's Arizona office and worked in Arizona.[12]

Plaintiffs' claims concern a series of multimillion dollar cash and asset transfers that Opus West made to its parent corporation, Opus Corporation ("Opus Corp."). Plaintiffs contend that Opus West began transferring funds to Opus Corp. on December 21, 2006, and that the transfers continued over the next several years.[13] In December 2006, Opus West transferred approximately $63,169,000 in assets to Opus Corp.[14] Commencing on March 15, 2007, and continuing through 2008, Opus West transferred $83,128,000 in cash to Opus Corp., allegedly without receiving

1. Complaint, Docket No. 1 (June 29, 2010).

2. Opus West is not a named defendant.

3. First Amended Complaint ("FAC"), Docket No. 58 (Jul. 11, 2010).

4. Motion to Dismiss Plaintiffs' RICO Claim (Count IV) and Partially Dismiss Plaintiffs' State Law Claims (Counts I–III, V, & VII) ("MTD"), Docket No. 62 (Aug. 5, 2011).

5. Request for Judicial Notice re: Motion to Dismiss ("RJN"), Docket No. 63 (Aug. 5, 2011).

6. Opposition to Motion to Dismiss ("Opp."), Docket No. 70 (Sept. 12, 2011).

7. Reply in Support of of Motion to Dismiss ("Reply"), Docket No. 73 (Oct. 7, 2011).

8. FAC, ¶ 19.

9. *Id.*, ¶ 20.

10. *Id.*, ¶ 132.

11. *Id.*, ¶ 33

12. *Id.*

13. *Id.*, ¶ 36.

14. *Id.*, ¶ 58.

any consideration in return.[15] Plaintiffs assert, on information and belief, that between 2003 and 2008, Opus transferred in excess of $193,814,000 to the two trust defendants, which plaintiffs denominate the Grandchildren Trust and the Children Trust.[16] In 2006 and 2007, Opus West transferred funds to Opus Corp. for contributions to organizations such as Catholic charities.[17] All of these transfers were purportedly made at the direction of defendant Mark Rauenhorst, Opus West's President and CEO, who sat on Opus Corp.'s board of directors, as well as at the direction of defendants Keith Bednarowski and Luz Campa.[18] The latter two defendants are trustees of the Grandchildren Trust and the Children Trust.[19]

Plaintiffs assert that the transfers continued until July 6, 2009, when Opus West filed a Chapter 11 bankruptcy petition.[20] As of that date, Opus West purportedly owed plaintiffs a total of $26,638,236.57 in compensation and deferred compensation.[21] Plaintiffs contend they learned shortly after the bankruptcy filing that Opus West would not pay the compensation and deferred compensation it allegedly owed.[22]

From 2005 through March 31, 2009, plaintiffs had written incentive compensation agreements with Opus West, which they allege were drafted and approved by defendants.[23] In 2006, before any of the acts pled in the complaint took place, Mark Rauenhorst and Gerald Rauenhorst,[24] Opus West's founding chairman, stated in a code of conduct provided to all employees that Opus West

"will transact our business fairly, honestly, and in a manner that meets the highest ethical and legal standards. It is the policy of Opus to comply with all federal, state and local laws, rules, and regulations. Opus will respect the rights, and safeguard the well being, of its employees, customers, and business associates. And, finally, Opus will not knowingly enter into a business relationship with any party who conveys the impression that they may violate any aspect of this Code of Conduct.... Each of us will exercise the highest level of integrity, ethics, and objectivity when representing, or negotiating on behalf of Opus, or when participating in activities that may affect the reputation of the company. We will not misuse the authority or influence of our positions in these relationships, nor become involved in situations that create a conflict of interest between Opus and us, such as

15. *Id.*, ¶ 59.

16. *Id.*, ¶ 60. The Children Trust is organized under Minnesota law, and is allegedly an irrevocable trust that Gerald Rauenhorst created for the benefit of his children. (*Id.*, ¶ 23.) The Grandchildren Trust is also organized under Minnesota law, and was created for the benefit of Gerald Rauenhorst's grandchildren. (*Id.*, ¶ 22.)

17. *Id.*

18. *Id.*

19. *Id.*, ¶¶ 24–25.

20. *Id.*, ¶¶ 30, 36, 61.

21. *Id.*, ¶ 35. The named plaintiffs are purportedly owed varying amounts of money ranging from $102,447.48 (Montgomery) to $13,700,123.00 (T. Roberts). (*Id.*, ¶ 34.) They allege that as of the end of 2006, 2007, and 2008, the amount of compensation and deferred compensation they were owed was at least 75%, at least 80%, and at least 90% of the current total owed respectively. (*Id.*, ¶ 35.)

22. *Id.*, ¶ 34.

23. *Id.*, ¶ 73.

24. Gerald Rauenhorst is not a party; his son, Mark Rauenhorst, is.

employment by, financial interest in, or financial gain from a competitor, supplier, agent or customer." [25]

In 2004, defendants selected KMPG, LLC as Opus West's auditor.[26] The firm prepared audited financial statements for Opus Corp. and Opus West from 2004 to 2007.[27] In 2005, defendants purportedly violated the covenants in various loans Opus West had obtained from lenders, the majority of which were federal banks.[28] In 2008, KMPG notified defendants that Opus West's financial statements contained accounting errors, and that the company's 2007 financial statement needed to be corrected and reissued.[29] Defendants allegedly hid this information from Opus West's lenders, as well as its secured and unsecured creditors.[30]

In 2008, KMPG notified defendants that some of Opus West's quarterly financial statements were also erroneous. It advised that defendants had recorded the sale of the Shoppes at Chino Hills, a retail project located in Chino Hills, California, incorrectly.[31] KMPG allegedly told defendants that had they recorded the Shoppes transaction as required by generally accepted accounting principles ("GAAP"), Opus West would have been in violation of the loan covenants for the quarters ending June 30 and September 30, 2008.[32] Plain-

tiffs assert that defendants "kept quiet" about this error and did not disclose the violations to Opus West's lenders; rather, they allege, defendants "kept their mouths shut even though they had a legal and contractual duty to disclose the fraud, and went about their business as if nothing wrong had happened." [33]

Defendants requested and obtained an extension of their loan covenants in 2006, but "intentionally forgot" to tell Opus West's lenders and creditors that the company's financial statements were inaccurate.[34] Plaintiffs assert, in fact, that Opus West received an emergency loan from defendants so that it would appear that it was in compliance with the loan covenants on the date the lenders intended to check debt to equity ratios.[35] The covenants required that Opus West maintain a four-to-one debt to equity ratio.[36] Once the compliance inspections were complete, Opus West allegedly returned the emergency loan to defendants.[37] Plaintiffs assert that defendants conducted these transactions by "intentionally shipping ('wiring'), or transferring money over the telephone lines" from Opus Corp.'s headquarters in Minneapolis, Minnesota and related Opus entities to Opus West in Phoenix, Arizona.[38] Plaintiffs assert that such transfers were made on at least six occasions be-

---

25. *Id.,* ¶ 37.

26. *Id.,* ¶ 39.

27. *Id.,* ¶ 40.

28. *Id.,* ¶ 41.

29. *Id.,* ¶ 42.

30. *Id.*

31. *Id.,* ¶ 43.

32. *Id.*

33. *Id.,* ¶ 43.

34. *Id.,* ¶ 44.

35. *Id.*

36. *Id.,* ¶ 97. The average debt-to-equity ratio in the industry was less than three-to-one. (*Id.*) Plaintiffs allege that the lower a company's debt to equity ratio, the safer a loan to it is, since the ratio reflects the leverage or risk the company has assumed. The debt to equity ratio is allegedly a prime indicator of a company's financial health. (*Id.*)

37. *Id.*

38. *Id.*

tween April 13, 2007, and September 30, 2008.[39] They contend the transfers were timed so that Opus West would appear to be in compliance with the loan covenants at the end of each quarter of years 2005 to 2008,[40] and that after quarter's end, Opus West returned the money to defendants.[41] Plaintiffs contend that classifying an emergency loan from a parent corporation as equity on the subsidiary's books, rather than as a liability, violates basic accounting rules.[42]

Plaintiffs assert that if Opus West's financial statements had been properly recorded in accordance with GAAP and Financial Accounting Standards Board ("FASB") standards, it would have been out of compliance with the loan covenants in each of years 2005 through 2008.[43] Under the terms of the loan agreements, Opus West was required to be in compliance with the covenants on each day the loans were outstanding, not just when the

banks were due to perform an inspection or audit.[44]

Plaintiffs allege that defendants knew that their conduct was "wrong, unethical and plainly illegal" at all times, and that it could result in "substantial" civil and criminal penalties.[45] They assert that Opus Corp., in particular, had a number of individuals on its board of directors who had legal and accounting experience, and who could have advised defendants regarding proper accounting and financial reporting practices, as well as the consequences of their purported bank fraud and embezzlement.[46] Plaintiffs assert that Opus Corp. has "exclusive[ ]" control of Opus West's accounting and computer systems, and the exclusive right to make basic entries on Opus West's financial statements.[47] Plaintiffs allege that Opus West did not have the right to make such entries, as Opus Corp. was the "sole 'cook' in the kitchen." [48] They also assert that

39. *Id.*

40. *Id.,* ¶ 44.

41. *Id.*

42. *Id.,* ¶ 97. Plaintiffs allege that the short term loans were disguised as subordinated debt, which is treated as equity for covenant compliance purposes. (*Id.*) Banks view subordinated debt as working capital for the company. (*Id.*) Paragraph 97 sets forth specific dates on which Opus Corp. transferred funds to Opus West, which were booked as subordinated debt, but paid back within a relatively short period of time.

43. *Id.,* ¶ 48.

44. *Id.,* ¶ 49.

45. *Id.,* ¶ 45.

46. *Id.* The complaint identifies four Opus Corp. board members: (1) Michael P. Sullivan, who served from 1994–2009, and who was and is licensed to practice law in Minnesota, served on the board of Fireman's Fund Insurance Company, was president and CEO

of International Dairy Queen, Inc. from 1987–2001, and was previously Special Counsel to the Minnesota Attorney General; (2) Joseph Roy Steiger, who was and is licensed to practice law in California, is a licensed real estate broker in California; (3) Dale Anne Reiss, who was and is a certified public accountant ("CPA") in New York and Illinois, was and is a Trustee of the Urban Land Institute, founded the Chicago office of Ernst & Young Kenneth Leventhal Real Estate Group in 1985 and served as its Managing Partner, and served as Global and Americas Director of Real Estate at Ernst & Young LLP until June 30, 2008; and (4) Gerald Rauenhorst's sister, Amy R. Goldman, who is "an experienced corporate officer" of Oaklawn Ventures, LLC, Ghr Foundation, Inc., and the Gerald and Henrietta Rauenhorst Foundation, Inc. (*Id.,* ¶¶ 45–46.) Although the complaint does not address the matter, the "Ghr Foundation" may well be related to the Gerald and Henrietta Rauenhorst Foundation.

47. *Id.,* ¶¶ 51–52.

48. *Id.,* ¶ 52.

at all relevant times, Gerald Rauenhorst told defendants' lenders and also stated at the annual vendor party that the Rauenhorst family "had always paid its debts and never defaulted on a loan in [the] company[']s history." [49] During conference calls with plaintiffs and Opus West officers, Gerald Rauenhorst and defendant Rauenhorst "assured [plaintiffs] that the Rauenhorst family would honor their obligations and do the right thing for the Opus West employees and that the Rauenhorsts could always be trusted." [50]

Plaintiffs contend, on information and belief, that on April 7, 2010, defendants' counsel admitted to a Wall Street Journal reporter that from 2005 until the time of the bankruptcy filing, Opus West transferred $150 million to Opus Corp.; the attorney purportedly said that of this amount, $120 million was distributed to the Grandchildren Trust and the Children Trust.[51] Plaintiffs contend that this constitutes a violation of the Employee Retirement Income Security Act of 1974 ("ERISA") and a violation of 18 U.S.C. § 664. They assert that a portion of the pension funds that were allegedly embezzled were used to bankroll one of Gerald Rauenhorst's new ventures.[52]

The complaint alleges seven causes of action: (1) intentional interference with contract; (2) inducing breach of contract; (3) violation of California Business & Professions Code § 17200 et seq. (Unfair Competition Law or "UCL"); (4) RICO violations under 18 U.S.C. § 1962(c)-(d) based on predicate acts of bank fraud, mail and wire fraud, and embezzlement; (5) unjust enrichment; (6) violation of ERISA, 29 U.S.C. § 1132 et. seq.; and (7) declaratory relief.

## II. DISCUSSION

### A. Legal Standard Governing Motions to Dismiss Under 12(b)(6)

A Rule 12(b)(6) motion tests the legal sufficiency of the claims asserted in the complaint. A Rule 12(b)(6) dismissal is proper only where there is either a "lack of a cognizable legal theory," or "the absence of sufficient facts alleged under a cognizable legal theory." *Balistreri v. Pacifica Police Dept.*, 901 F.2d 696, 699 (9th Cir.1988). The court must accept all factual allegations pleaded in the complaint as true, and construe them and draw all reasonable inferences from them in favor of the nonmoving party. *Cahill v. Liberty Mut. Ins. Co.*, 80 F.3d 336, 337–38 (9th Cir.1996); *Mier v. Owens*, 57 F.3d 747, 750 (9th Cir.1995).

The court need not, however, accept as true unreasonable inferences or legal conclusions cast in the form of factual allegations. See *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 553–56, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007) ("While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do"). Thus, a plaintiff's complaint must "contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' . . . A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ash-*

---

49. *Id.*, ¶ 53.

50. *Id.*, ¶ 103.

51. *Id.*, ¶ 69. A copy of the article containing the alleged admission is attached to the complaint as Exhibit 3.

52. *Id.*, ¶ 104.

*croft v. Iqbal,* 556 U.S. 662, 129 S.Ct. 1937, 1949, 173 L.Ed.2d 868 (2009); see also *Twombly,* 550 U.S. at 545, 127 S.Ct. 1955 ("Factual allegations must be enough to raise a right to relief above the speculative level, on the assumption that all the allegations in the complaint are true (even if doubtful in fact)" (citations omitted)); *Moss v. United States Secret Service,* 572 F.3d 962, 969 (9th Cir.2009) ("[F]or a complaint to survive a motion to dismiss, the non-conclusory 'factual content,' and reasonable inferences from that content, must be plausibly suggestive of a claim entitling the plaintiff to relief," citing *Iqbal* and *Twombly* ). The Ninth Circuit recently summarized the standard as follows:

"First, to be entitled to the presumption of truth, allegations in a complaint or counterclaim may not simply recite the elements of a cause of action, but must contain sufficient allegations of underlying facts to give fair notice and to enable the opposing party to defend itself effectively. Second, the factual allegations that are taken as true must plausibly suggest an entitlement to relief, such that it is not unfair to require the opposing party to be subjected to the expense of discovery and continued litigation." *Starr v. Baca,* 652 F.3d 1202, 1216 (9th Cir.2011).

**B. Defendants' Request for Judicial Notice**

■ With their motions to dismiss, defendants filed requests asking that the court take judicial notice of documents related to plaintiffs' claims, namely, the deferred compensation plans referenced in the complaint.[53] In deciding a Rule 12(b)(6) motion, the court generally looks only to the face of the complaint and documents attached thereto. *Van Buskirk v. Cable News Network, Inc.,* 284 F.3d 977, 980 (9th Cir.2002); *Hal Roach Studios, Inc. v. Richard Feiner & Co., Inc.,* 896 F.2d 1542, 1555 n. 19 (9th Cir.1990). It may, however, consider documents that are incorporated by reference but not physically attached to the complaint if they are central to plaintiffs' claims and no party questions their authenticity. See *Marder v. Lopez,* 450 F.3d 445, 448 (9th Cir. 2006) (in ruling on a motion to dismiss for failure to state a claim, "[a] court may consider evidence on which the complaint 'necessarily relies' if: (1) the complaint refers to the document; (2) the document is central to the plaintiff's claim; and (3) no party questions the authenticity of the copy attached to the 12(b)(6) motion," citing *Branch v. Tunnell,* 14 F.3d 449, 453–54 (9th Cir.1994), overruled on other grounds, *Galbraith v. County of Santa Clara,* 307 F.3d 1119 (9th Cir.2002); *Warren v. Fox Family Worldwide, Inc.,* 328 F.3d 1136, 1141 n. 5 (9th Cir.2003); and *Chambers v. Time Warner, Inc.,* 282 F.3d 147, 153 n. 3 (2d Cir.2002)); see also *Sanders v. Brown,* 504 F.3d 903, 910 (9th Cir.2007) ("Review is generally limited to the contents of the

---

**53.** Request for Judicial Notice re: Motion to Dismiss ("RJN"), Docket No. 63 (Aug. 5, 2011). The documents in question are:
- Exhibit A: Opus West Corporation SAR Plan (as amended and restated effective January 1, 2008);
- Exhibit B: Opus 80120 Plan for Officers (as amended and restated effective January 1, 2008);
- Exhibit C: Opus Deferred Compensation Plan for Operating Subsidiaries (also known as the "Presidents Plan");
- Exhibit D: Opus West Corporation Incentive Compensation Plan (effective January 1, 2008) and Amendment to the Opus West Corporation Incentive Compensation Plan, dated February 22, 2010;
- Exhibit E: Opus West Corporation Incentive Compensation Plan for John W. Greer (effective January I, 2008) and Opus West Corporation Long Term Incentive Compensation Plan for John Greer, dated December 11, 2006. (*Id.* at 1.)

complaint, but a court can consider a document on which the complaint relies if the document is central to the plaintiff's claim, and no party questions the authenticity of the document," citing *Warren*, 328 F.3d at 1141 n. 5); *Lee v. City of Los Angeles*, 250 F.3d 668, 688 (9th Cir.2001) ("If the documents are not physically attached to the complaint, they may be considered if the documents' 'authenticity . . . is not contested' and 'the plaintiff's complaint necessarily relies' on them," citing *Parrino v. FHP, Inc.*, 146 F.3d 699, 705–06 (9th Cir.1998)); *In re Silicon Graphics Inc. Securities Litigation*, 183 F.3d 970, 986 (9th Cir.1999) ("[The incorporation by reference doctrine] permits a district court to consider documents 'whose contents are alleged in a complaint and whose authenticity no party questions, but which are not physically attached to the [plaintiff's] pleading,'" quoting *Branch*, 14 F.3d at 454).

The documents defendants seek to have the court consider are deferred compensation plans for Opus West employees. These plans are specifically referenced in the complaint and form the basis of plaintiffs' claims.[54] Plaintiffs do not object to defendants' request, and in fact rely on the documents appended to the request for judicial notice to support their arguments.[55] Consequently, the court will consider the documents in ruling on the motion.

### C. Whether ERISA Preempts Plaintiffs' State Law Causes of Action

#### 1. Legal Standard Governing ERISA Preemption

"Congress enacted ERISA to 'protect . . . the interests of participants in employee benefit plans and their beneficiaries' by setting out substantive regulatory requirements for employee benefit plans and to

'provid[e] for appropriate remedies, sanctions, and ready access to the Federal courts.'" *Aetna Health Inc. v. Davila*, 542 U.S. 200, 208, 124 S.Ct. 2488, 159 L.Ed.2d 312 (2004) (quoting 29 U.S.C. § 1001(b)). "There are two strands of ERISA preemption: (1) 'express' preemption under ERISA § 514(a), 29 U.S.C. § 1144(a); and (2) preemption due to a 'conflict' with ERISA's exclusive remedial scheme set forth in 29 U.S.C. § 1132(a), notwithstanding the lack of express preemption." *Paulsen v. CNF Inc.*, 559 F.3d 1061, 1081 (9th Cir.2009).

ERISA's express preemption provisions "are intended to ensure that employee benefit plan regulation [is] 'exclusively a federal concern.'" *Davila*, 542 U.S. at 208, 124 S.Ct. 2488 (quoting *Alessi v. Raybestos–Manhattan, Inc.*, 451 U.S. 504, 523, 101 S.Ct. 1895, 68 L.Ed.2d 402 (1981), and citing ERISA § 514, 29 U.S.C. § 1144). Except for state laws regulating insurance, banking, or securities, ERISA "supersede[s] any and all State laws insofar as they may now or hereafter relate to any employee benefit plan." 29 U.S.C. § 1144(a). "State laws" include "all laws, decisions, rules, regulations, or other State action having the effect of law . . . ." *Id.*, § 1144(c)(1).

ERISA conflict preemption is based on Section 502(a) of ERISA, codified at 29 U.S.C. § 1132(a). That statute prescribes "a comprehensive civil enforcement scheme that represents a careful balancing of the need for prompt and fair claims settlement procedures against the public interest in encouraging the formation of employee benefit plans." *Pilot Life Ins. Co. v. Dedeaux*, 481 U.S. 41, 54, 107 S.Ct. 1549, 95 L.Ed.2d 39 (1987). "A state cause of action that would fall within the scope of

---

**54.** FAC, ¶¶ 34, 62, 71, 82, 111, 117, 124.

**55.** Opp. at 7.

this scheme of remedies is preempted as conflicting with the intended exclusivity of the ERISA remedial scheme, even if those causes of action would not necessarily be preempted by [ERISA's express preemption provisions]." *Cleghorn v. Blue Shield of California*, 408 F.3d 1222, 1225 (9th Cir.2005); see also *Pilot Life Ins. Co.*, 481 U.S. at 54, 107 S.Ct. 1549 (noting that "policy choices reflected in the inclusion of certain remedies and the exclusion of others under the federal scheme would be completely undermined if ERISA-plan participants and beneficiaries were free to obtain remedies under state law that Congress rejected in ERISA").

Plaintiffs' deferred compensation plans are allegedly "top hat" plans subject to ERISA.[56] The parties agree that plaintiffs seek compensation under two sets of plans—the top hat plans, and Opus West's bonus and incentive benefit programs ("benefit programs"), which are not governed by ERISA. To the extent plaintiffs' claims are based on the top hat plans, however, they may be subject to ERISA preemption.

### 2. Plaintiffs' Arguments Regarding ERISA Preemption

Plaintiffs plead five state law causes of action: (1) intentional interference with contract; (2) inducing breach of contract; (3) violations of California's UCL; (4) unjust enrichment; and (5) declaratory relief.

Defendants assert that both strands of ERISA preemption apply to these claims "to the extent . . . [plaintiffs] seek to recover benefits allegedly due under the top hat plans. . . ." They concede that the claims are not preempted by ERISA to the extent they seek compensation under the benefit programs.[57] For the most part, plaintiffs do not dispute the substance of defendants' ERISA preemption arguments.[58] Rather, they offer two responses in an attempt to avoid ERISA preemption. First, they assert that a motion seeking dismissal of "only a part of a claim" is procedurally flawed; second, they contend that their unfair competition and unjust enrichment claims are based, in part, on federal common law, and thus survive preemption.[59] The court addresses each argument in turn.

Plaintiffs first argue that since Rule 12(b)(6) tests the legal sufficiency of "claims," a motion that seeks to dismiss only part of a claim is defective. Other courts confronted with claims that are only partially preempted have dismissed the claims to the extent they seek compensation under ERISA-covered plans, but permitted them to proceed as to non-ERISA plans. See *In re SmithKline Beecham Clinical Laboratories, Inc. Laboratory Test Billing Practices Litig.*, 108 F.Supp.2d 84, 111 n. 64 (D.Conn.1999) (having dismissed portions of claims as preempted by ERISA, the court stated:

---

**56.** FAC, ¶ 94. ERISA defines a "top hat" plan as "a plan which is unfunded and is maintained by an employer primarily for the purpose of providing deferred compensation for a select group of management or highly compensated employees." 29 U.S.C. § 1101(a)(1).

**57.** MTD at 8, 1 n. 1 ("Granting Defendants' motion will leave Plaintiffs with only two claims remaining to be decided either on summary judgment or at trial—namely: (1) Plaintiff[s'] state law claims seeking compensation under Opus West's non-ERISA benefit programs (totaling an alleged $1.1 million); and (2) Plaintiffs' single ERISA claim (Count VI) (totaling an alleged $8.4 million)).

**58.** Plaintiffs do raise one argument challenging the applicability of express preemption to their claims, which the court addresses *infra*.

**59.** Plaintiffs do not similarly contend that their intentional interference with contract, inducing breach of contract, and declaratory relief claims arise under federal common law.

"It is not clear from the second amended complaint whether the plaintiff insurers' state law causes of action for fraud and unjust enrichment seek relief from payments the insurers made to SBCL on behalf of benefit plans not governed by ERISA; to the extent they do, those claims are not preempted by ERISA"); *Center for Special Procedures v. Connecticut General Life Ins. Co.*, Civil Action No. 09–6566(MLC), 2010 WL 5068164, *3 (D.N.J. Dec. 6, 2010) ("We find that Count 1 through Count 9 of the Second Amended Complaint, insofar as they are asserted as to the ERISA plans, are expressly preempted by ERISA because they 'relate to' Defendants' administration of the ERISA plans"); *Stephens v. American Republic Ins. Co.*, No. 304CV0969, 2005 WL 1875055, *4 (M.D.Tenn. Aug. 5, 2005) ("Because the language in Count IV itself is not clear on that point, however, the Court holds that to the extent Count IV states a breach-of-contract claim that relates to ERISA, it is preempted, but insofar as Count IV relates to breach of any alleged contract pertaining to incentive based compensation, it will not be preempted").

The lone authority plaintiffs cite in support of their procedural argument is *Thompson v. Paul*, 657 F.Supp.2d 1113 (D.Ariz.2009). *Thompson*, however, is clearly inapposite. The court there stated that a Rule 12(b)(6) motion to dismiss could not "be used to strike certain allegations in support of a claim, where the underlying claim itself is not challenged." *Id.* at 1129. It was reviewing a case that had been remanded after the Ninth Circuit had reversed the dismissal of a claim and directed that plaintiffs be given leave to amend. *Id.* Plaintiffs included two additional *factual* allegations in their first amended complaint; defendants chal-

lenged these under Rule 12(b)(6). *Id.* The district court found that Rule 12(b)(6) was not an appropriate vehicle to employ in seeking to have the allegations struck, and construed defendants' motion as a motion to strike under Rule 12(f). *Id.*

■ Here, defendants challenge the legal sufficiency of plaintiffs' allegations to the extent they are based on ERISA-covered compensation plans; they do not suggest that any of the allegations are "redundant, immaterial, impertinent, or scandalous matter." FED.R.CIV.PROC. 12(f). As plaintiffs' argument is not supported by case law and is contrary to district court decisions examining the issue, the court concludes that plaintiffs' state law claims seeking compensation under ERISA-covered plans are separable from their claims seeking compensation under non-covered plans.

■ Plaintiffs further argue that their unjust enrichment and unfair competition claims withstand ERISA preemption because they are based on a "trust fund" theory, which "views corporate assets as held in trust for the benefit of the corporation's creditors." [60] As a result, they assert, the claims arise in part under "federal common law," as to which there is neither express or conflict ERISA preemption.[61] As noted above, the complaint's third cause of action pleads a violation of the UCL, California Business & Professions Code § 17200 et seq., a state law that prohibits unlawful, unfair, or fraudulent business acts or practices. Federal courts have interpreted UCL claims under state law rather than federal common law. See, e.g., *Argueta v. J.P. Morgan Chase*, 787 F.Supp.2d 1099, 1104–05 (E.D.Cal.2011) (citing California cases while interpreting a UCL claim); *Fortale-*

---

**60.** Opp. at 10.

**61.** *Id.*

za v. PNC Financial Services Group, Inc., 642 F.Supp.2d 1012, 1019 (N.D.Cal. 2009) (applying California law to interpret a UCL claim); Meta–Film Associates, Inc. v. MCA, Inc., 586 F.Supp. 1346, 1360 (C.D.Cal.1984) ("Although the second of these actions does state an unfair competition claim, plaintiff's remedy for such a claim, under California law, is limited to injunctive relief."). Courts have also deemed claims under the UCL subject to preemption by federal statutes. Cleghorn, 408 F.3d at 1227 (dismissing state law claims, including those arising under the UCL, as ERISA-preempted); see also In re Pharmaceutical Industry Average Wholesale Price Litig., 309 F.Supp.2d 165, 177 (D.Mass.2004) ("Accordingly, I conclude that the California UCL is preempted under ERISA to the extent it seeks to give private attorneys general the right to stand in the shoes of ERISA fiduciaries in protecting or administering plan assets"); cf. Sprewell v. Golden State Warriors, 231 F.3d 520, 529–30 (9th Cir.2000) (deeming claims arising under § 17200 preempted by FLSA); Scala v. Citicorp, Inc., No. C 10–03859 CRB, 2011 WL 900297, *7 n. 7 (N.D.Cal. Mar. 15, 2011) (holding that federal Securities Litigation Uniform Standards Act of 1998's "preemptive effect applies equally to Plaintiffs' claim based on §§ 17200 and 17203 of the California Business and Professional Code.").[62]

Plaintiffs' assertion that their unjust enrichment claim arises under federal law is equally unpersuasive. In Lea v. Republic Airlines, Inc., 903 F.2d 624 (9th Cir.1990),

the Ninth Circuit considered an argument that it had permitted "state-law claims [to be] recharacterized as federal claims if federal law 'provides both a superseding remedy replacing the state law cause of action and preempts that state law cause of action,'" that the Supreme Court had "authorize[d] the federal courts to develop a 'federal common law of rights and obligations under ERISA-regulated plans,'" and that therefore, the Supreme Court had "intended to authorize a 'federal common law for ERISA' by permitting ordinary common law claims." Id. at 632. In a later case, the court explained that "the Supreme Court's approval of the development of a federal common law under ERISA does not authorize the creation of federal common law causes of action." Pacificare Inc. v. Martin, 34 F.3d 834, 836 (9th Cir.1994). Because a claim for unjust enrichment does not invoke one of the "specific remedies" that ERISA provides, it is not cognizable under federal common law. Id. ("Since Pacificare's federal common law cause of action for reimbursement, based on [unjust enrichment under] Provident Life [and Accident Ins. Co. v. Waller, 906 F.2d 985 (4th Cir.), cert. denied, 498 U.S. 982, 111 S.Ct. 512, 112 L.Ed.2d 524 (1990),] does not invoke one of the specific remedies listed in section 1132, Pacificare has failed to state a cause of action permissible under ERISA"); Board of Trustees for the Laborers Health and Welfare Trust Fund for Northern California v. Hill, No. C 07–05849 CW, 2008 WL

---

**62.** It is true that under the unlawful prong of California's UCL, a plaintiff can state a claim by pleading the existence of a practice forbidden by another law, be it state or federal. See Briosos v. Wells Fargo Bank, 737 F.Supp.2d 1018, 1033 (N.D.Cal.2010) ("The 'unlawful' practices prohibited by section 17200 are any practices forbidden by law, be it civil or criminal, federal, state, or municipal, statutory, regulatory, or court-made."

Thus, § 17200 " 'borrows' violations of other laws and treats them as unlawful practices independently actionable under section 17200," quoting Saunders v. Superior Court, 27 Cal.App.4th 832, 838–39, 33 Cal.Rptr.2d 438 (1994). Relying on the existence of a federal right or prohibition, however, does not transform a UCL claim into a federal claim or take it outside the extensive body of ERISA preemption law discussed infra.

239184, *6 (N.D.Cal. Jan. 28, 2008) (holding that ERISA "does not permit a plaintiff to assert an independent federal common law cause of action, such as unjust enrichment, to enforce the terms of an ERISA plan. Thus, to the extent Plaintiff's third cause of action for unjust enrichment is brought pursuant to a federal common law right, it must be dismissed").

Plaintiffs, moreover, fail to identify the source of the court's power to fashion the federal common law cause of action they posit, instead citing two Illinois district court cases that concern a federal court's equitable power to impose a constructive trust under ERISA, and the fact that a fraudulent conveyance claim is not preempted by ERISA. See *Central States, Southeast and Southwest Areas Pension Fund v. LaCasse,* 254 F.Supp.2d 1069, 1072 (N.D.Ill.2003) ("Whether it is viewed as a state or a federal common law claim, then, the plaintiffs' fraudulent conveyance claim is not preempted by ERISA"); *Central States, Southeast and Southwest Areas Pension Fund v. Minneapolis Van & Warehouse Co.,* 764 F.Supp. 1289, 1295–96 (N.D.Ill.1991) ("This Court accordingly exercises its equitable powers under ERISA to impose a constructive trust on the distributed assets (or on the sale price of any assets distributed and then sold) for the benefit of Pension Fund" (citations omitted)). As the *LaCasse* court noted, the reason that state law fraudulent conveyance claims are not preempted is that "ERISA provides no mechanism for the enforcement of judgments, [and thus] 'state-law methods for collecting money judgments must, as a general matter, remain undisturbed by ERISA.'" *LaCasse,* 254 F.Supp.2d at 1071 (quoting *Mackey v. Lanier Collection Agency, & Service, Inc.,* 486 U.S. 825, 843, 108 S.Ct. 2182, 100 L.Ed.2d 836 (1988)). Plaintiffs' unfair competition claim alleges that the transfers were wrongful. They must first prove

this before they can pursue any collection mechanism, be it an action alleging fraudulent conveyance or imposition of a constructive trust. Additionally, the transfer itself is the unfair or unlawful act on which the claim is premised; contrary to plaintiffs' assertion, the claim is not premised on a theory that the monies that were transferred are being held in trust for creditors of the corporation. As respects *Minneapolis Van & Warehouse Co.,* the corporate entity that owed withdrawal liability to an ERISA fund in that case had been dissolved and its assets distributed to the shareholders. See *Minneapolis Van & Warehouse Co.,* 764 F.Supp. at 1294. Here, the entity that allegedly owes compensation under the plans to plaintiffs, although in bankruptcy proceedings, remains in existence. Consequently, the court concludes that the decisions are not apposite, and provide no support for the proposition that either plaintiffs' state law unfair competition or unjust enrichment claim arises, even in part, under federal common law. Consequently, plaintiffs' effort to avoid ERISA preemption fails. See *Board of Trustees, Sheet Metal Workers' Nat. Pension Fund v. Illinois Range, Inc.,* 71 F.Supp.2d 864, 869 (N.D.Ill.1999) (rejecting a claim that plaintiff could pursue a federal common law unjust enrichment claim to recover assets transferred by an employer to its sole shareholder, which in turn transferred the monies to its individual owners, where the transfers rendered the employer unable to pay its withdrawal liability to the pension fund, because such a claim was not necessary to fill a gap in ERISA). See generally *Pacificare Inc. v. Martin,* 34 F.3d 834 (9th Cir.1994) ("In *Lea v. Republic Airlines, Inc.,* 903 F.2d 624, 632 (9th Cir.1990), we rejected the argument that 'the Supreme Court intended to authorize a federal common law for ERISA by permitting ordinary common

law claims' when it 'authoriz[ed] the federal courts to develop a federal common law of rights and obligations under ERISA regulated plans.' ... We explained that the Supreme Court's approval of the development of a federal common law under ERISA does not authorize the creation of federal common law causes of action. 'The federal common law that the Court envisioned relates to rights and obligations under the ERISA plan and not to causes of action....' 'Claims relating to ERISA plans must therefore invoke the specific remedies of ERISA § 502, 29 U.S.C. § 1132 ...' ").

### 3. Whether Plaintiffs' State Law Claims Are Subject to ERISA Conflict Preemption

The court thus turns to the merits of defendants' claim that ERISA preempts plaintiffs' state law causes of action. As noted, any state law claim that "would fall within the scope of [ERISA's] scheme of remedies is preempted as conflicting with the intended exclusivity of the ERISA remedial scheme." *Paulsen*, 559 F.3d at 1084. ERISA's exclusive enforcement provision "outlines a participant's possible claims, which include' (1) an action to recover benefits due under the plan, ERISA § 502(a)(1)(B); (2) an action for breach of fiduciary duties, ERISA § 502(a)(2); and (3) a suit to enjoin violations of ERISA or the Plan, or to obtain other equitable relief.'" *Id.* (quoting *Bast v. Prudential Ins. Co. of Am.*, 150 F.3d 1003, 1008 (9th Cir.1998)). As the Supreme Court has explained,

> "[T]he detailed provisions of § 502(a) set forth a comprehensive civil enforcement scheme that represents a careful balancing of the need for prompt and fair claims settlement procedures against the public interest in encouraging the formation of employee benefit plans. The policy choices reflected in the inclusion of

certain remedies and the exclusion of others under the federal scheme would be completely undermined if ERISA-plan participants and beneficiaries were free to obtain remedies under state law that Congress rejected in ERISA. 'The six carefully integrated civil enforcement provisions found in § 502(a) of the statute as finally enacted ... provide strong evidence that Congress did not intend to authorize other remedies that it simply forgot to incorporate expressly.'" *Pilot Life Ins. Co.*, 481 U.S. at 54, 107 S.Ct. 1549 (quoting *Massachusetts Mut. Life Ins. Co. v. Russell*, 473 U.S. 134, 146, 105 S.Ct. 3085, 87 L.Ed.2d 96 (1985)).

See also *Davila*, 542 U.S. at 209, 124 S.Ct. 2488 ("[A]ny state-law cause of action that duplicates, supplements, or supplants the ERISA civil enforcement remedy conflicts with the clear congressional intent to make the ERISA remedy exclusive and is therefore pre-empted"). Consequently, if an employee's claim can be characterized as a claim "to recover benefits due ... under the terms of the plan" as allowed by ERISA § 502(a)(t)(B)), "the claim [is] likely ... conflict preempted because ERISA would provide both a cause of action and an enforcement remedy." *Paulsen*, 559 F.3d at 1084; *Cleghorn*, 408 F.3d at 1226 (holding that claims were preempted where "the factual basis of the complaint ... was the denial of reimbursement of plan benefits"); see also *id.* at 1225 (characterizing ERISA's preemptive force as "powerful").

ERISA's preemptive scope extends to all of plaintiffs' state law claims, since all unequivocally seek the return of benefits plaintiffs claim are due under the plans. Plaintiffs' UCL claim, for example, seeks "the return of the deferred compensation and pension funds that were fraudulently transferred from Opus West to Defendant Opus and to Defendant Grandchildren

Trust and Defendant Children Trust." [63] Similarly, the unjust enrichment claim seeks the return of "funds taken from Plaintiffs by Defendants," namely "Plaintiffs' pension funds, salary, bonuses, and *deferred compensation* ...." [64] The claims, therefore, constitute "action[s] to recover benefits due under the plan." *Bast,* 150 F.3d at 1008; see also *Cleghorn,* 408 F.3d at 1226 ("The relief sought on the claims most strongly argued to survive preemption included restitutionary relief, disgorgement of profits, injunctive and other equitable relief, and attorneys' fees"). The declaratory relief claim is based on plaintiffs' allegedly "valid and enforceable contracts with Defendants for deferred compensation plans and pension plans," and seeks "a judicial determination of [plaintiffs'] rights and duties, and a declaration as to who is the responsible party for the compensation obligations." [65] Insofar as the declaratory relief claim seeks to recover benefits due under the compensation plans, and is premised on an interpretation of those plans, it is preempted by ERISA.[66]

A closer examination of plaintiffs' intentional interference with contract and inducing breach of contract claims (Counts I and II) further supports this analysis. Although they did not raise this argument in their briefs, plaintiffs asserted at oral argument that while the recovery they seek on these claims is coterminous with the benefits they are due under the plans, in actuality they seek damages stemming from defendants' interference with and inducement of the breach of the ERISA benefits contracts.

While plaintiffs' argument is not without merit, it is ultimately unpersuasive. Plaintiffs cite *Paulsen* as support for their position. There, the Ninth Circuit considered a negligence action against an actuarial service provider that, in connection with the spin-off of a portion of a corporation and defined benefit plan to a new company, valued the benefits liabilities being transferred and the assets being transferred to cover the liabilities. 559 F.3d at 1065. In holding that this claim survived conflict preemption, the Ninth Circuit observed that the negligence claim "did not seek damages based on a breach of fiduciary duty and [did] not seek to enjoin [defendant] in any way...." It continued: "[T]he Employees are not suing for benefits based on plan language—they are suing for state law negligence damages." *Id.*

---

**63.** FAC at 35.

**64.** *Id.,* ¶¶ 111–12 (emphasis added). The fact that certain of the defendants are not ERISA fiduciaries does not change this result. See *Heritage Equity Group 401(k) Savings Plan v. Crosslin Supply Co., Inc.,* 638 F.Supp.2d 869, 874 (M.D.Tenn.2009) ("The Supreme Court found that fiduciaries or plan beneficiaries could maintain an ERISA action against a non-fiduciary third party ('other person') who knowingly participates in a fiduciary violation.... Thus, a state law claim for unjust enrichment against a non-fiduciary third-party for equitable remedies, particularly a constructive trust, such as the one brought by Plaintiffs here, has essentially been found within the 'comprehensive civil enforcement scheme' of ERISA by the Supreme Court,"

citing *Harris Trust and Savings Bank v. Salomon Smith Barney Inc.,* 530 U.S. 238, 248–49, 120 S.Ct. 2180, 147 L.Ed.2d 187 (2000)).

**65.** *Id.,* ¶¶ 125, 128.

**66.** The declaratory relief claim does not specify under which plans plaintiffs contend they are owed benefits. It states only that "Defendants Opus and Opus LLC are obligated to pay on certain of the deferred compensation plans and pension plans like the Presidents Deferred compensation plan and the Opus 80/20 officer and non-officer deferred compensation plans...." (FAC, ¶ 127.) Insofar as the plaintiffs seek a determination of benefits under ERISA plans, the claim is preempted. Insofar as non-ERISA plans are at issue, the declaratory relief claim is not preempted.

at 1084. This result was sensible since the actuary was not responsible for paying plaintiffs benefits under the plans, and the calculation of damages on the negligence claim was based entirely on a "duty owed . . . under state law . . ." that was separate from any benefits recoverable under the plans. *Id.* (noting that "[o]ne could . . . analogize the Employees' claim as one 'to recover benefits due . . . under the terms of the plan.' 29 U.S.C. § 1132(a)(1)(B). If so, then the claim would likely be conflict preempted because ERISA would provide both a cause of action and an enforcement remedy. However, the Employees are not suing for benefits based on plan language—they are suing for state law negligence damages").

Here, plaintiffs arguably allege claims similar to those in *Paulsen* in that they contend defendants violated general state law duties not to interfere with, or induce the breach of, valid enforceable contracts. The relief they seek on the claims, however, is couched almost entirely in terms of recovering benefits allegedly owed under the benefit plans. The complaint requests that any funds transfers from Opus West to defendants "be set aside and declared void as to the Plaintiffs herein to the extent necessary to satisfy Plaintiffs' claims" under the benefit plans. Additionally, it seeks, *inter alia*, attachment of the property in which plaintiffs allegedly have an interest, a restraining order preventing de-

fendants from transferring, selling, or otherwise disposing of the property, an order "declaring that [defendants] hold the property . . . in trust for Plaintiffs," and an accounting of all profits and proceeds earned from the property.[67] This relief is almost entirely coterminous with the relief plaintiffs seek under ERISA, which includes payment of contributions allegedly owed under the plans, imposition of a constructive trust, and an accounting of profits.[68] In contrast to *Paulsen*, plaintiffs here seek the direct payment of benefits that they claim they are owed under the plans, and that defendants allegedly have in their possession. Consequently, their claims for tortious interference with contract and inducing breach of contract seek to "duplicate, supplement, or supplant" the remedies provided by ERISA. See *Dishman v. UNUM Life Ins. Co. of America*, 269 F.3d 974, 983 (9th Cir.2001) ("Claimants simply cannot obtain relief by dressing up an ERISA benefits claim in the garb of a state law tort").

Consequently, all of plaintiffs' state law causes of action are preempted to the extent they seek to recover compensation owed under the top hat plans. See *Rush Prudential HMO, Inc. v. Moran*, 536 U.S. 355, 375, 122 S.Ct. 2151, 153 L.Ed.2d 375 (2002) (recognizing that ERISA's preemption regime is driven by the "overpowering federal policy" in favor of federal regulation).[69]

---

67. FAC at 34–35.

68. *Id.* at 38. That plaintiffs seek general and punitive damages on these causes of action does not alter the analysis. (*Id.* at 35.) The first amended complaint contains no allegations as to what those damages might be other than the loss of the plan benefits plaintiffs claim they were due. While it may might possible to allege state law claims that seek relief different than the benefits owed, *this* complaint does not do so. Compare *Grand*

*Park Surgical Center, Inc. v. Inland Steel Co.*, 930 F.Supp. 1214, 1217 (N.D.Ill.1996) (noting that under one "possible reading" of plaintiffs' complaint, their "theory of recovery [did] not refer to the health insurance plans," permitting it to survive preemption).

69. Given the court's conclusion regarding ERISA *conflict preemption, it need not* address the parties' remaining preemption arguments.

## D. Whether Plaintiff's Complaint States a RICO Claim

### 1. Substantive Elements of a RICO Claim

Defendants also move to dismiss plaintiffs' RICO claims, which are brought under 18 U.S.C. § 1962(c)-(d). § 1962(c) states that

"It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt."

§ 1962(d) punishes a party's conspiracy to violate any of other subsections of the statute, including § 1962(c). See *United States v. Turkette*, 452 U.S. 576, 583, 101 S.Ct. 2524, 69 L.Ed.2d 246 (1981) ("In order to [prevail] under RICO, [a party] must prove both the existence of an 'enterprise' and the connected 'pattern of racketeering activity.' The enterprise is an entity.... The pattern of racketeering activity is, on the other hand, a series of criminal acts as defined by the statute"); *Forsyth v. Humana, Inc.*, 114 F.3d 1467, 1481 (9th Cir.1997) (plaintiff must allege "(1) the conduct; (2) of an enterprise; (3) through a pattern; (4) of racketeering activity"). Racketeering activity is any act indictable under the provisions of 18 U.S.C. § 1961. *Forsyth*, 114 F.3d at 1481. Section 1961(1) contains an exhaustive list of violations that can be used as "predicate acts" forming the basis for a RICO violation under § 1962. A "pattern" requires the commission of at least two acts of "racketeering activity" within a ten-year period. 18 U.S.C. § 1961(5). An "enterprise" includes "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." 18 U.S.C. § 1961(4).

■ In addition to these elements, a plaintiff must plead that defendants' violation was both the "but for" and proximate cause of a concrete financial injury. *Resolution Trust Corp. v. Keating*, 186 F.3d 1110, 1117 (9th Cir.1999); *Forsyth*, 114 F.3d at 1481 (citing *Imagineering, Inc. v. Kiewit Pacific Co.*, 976 F.2d 1303, 1311 (9th Cir.1992), cert. denied, 507 U.S. 1004, 113 S.Ct. 1644, 123 L.Ed.2d 266 (1993)).

### 2. The Heightened Pleading Requirements of Rule 9(b) Apply to RICO Fraud Allegations

■ The complaint alleges that defendants violated RICO through "bank fraud, mail and wire fraud and embezzlement." [70] All RICO claims involving fraud must be alleged with particularity under Rule 9(b). Fed.R.Civ.Proc. 9(b); *Lancaster Community Hospital v. Antelope Valley Hospital District*, 940 F.2d 397, 405 (9th Cir.1991), cert. denied, 502 U.S. 1094, 112 S.Ct. 1168, 117 L.Ed.2d 414 (1992); *U.S. Concord, Inc. v. Harris Graphics Corp.*, 757 F.Supp. 1053, 1061 (N.D.Cal.1991) ("The Ninth Circuit has held that allegations of predicate acts under RICO must comply with Rule 9(b)'s specificity requirements," citing *Schreiber Distributing Co. v. Serv–Well Furniture Co.*, 806 F.2d 1393, 1400–01 (9th Cir.1986)).

Rule 9(b) requires that a plaintiff allege the time, place, and manner of each predicate act, the nature of the scheme involved, and the role of each defendant in the scheme. *Lancaster Community Hos-*

---

**70.** FAC, ¶ 95. The predicate acts for the alleged RICO violations are 18 U.S.C. § 1344 (bank fraud), §§ 1341, 1343 (mail and wire fraud) and § 664 (embezzlement of funds from ERISA-governed employee benefit plans).

*pital,* 940 F.2d at 405 (stating that a RICO plaintiff must allege the time, place and manner of each act of fraud, and the role of each defendant in the fraud); see also *Advocacy Organization for Patients and Providers v. Auto Club Ins. Ass'n.,* 176 F.3d 315, 322 (6th Cir.1999) (holding that a RICO plaintiff must allege, "at a minimum, the time, place and content of the alleged misrepresentations on which he or she relied; the fraudulent scheme; the fraudulent intent of the defendants; and the injury resulting from the fraud"); see generally *Gotham Print, Inc. v. American Speedy Printing Centers, Inc.,* 863 F.Supp. 447, 457 (E.D.Mich.1994) ("Courts have been particularly sensitive to Fed. R. Civ. Pro. 9(b)'s pleading requirements in RICO cases in which the 'predicate acts' are mail fraud and wire fraud, and have further required specific allegations as to which defendant caused what to be mailed (or made which telephone calls), and when and how each mailing (or telephone call) furthered the fraudulent scheme").

■ Rule 9(b) requires that the facts constituting the fraud be pled with specificity. Conclusory allegations are insufficient. FED.R.CIV.PROC. 9(b); *Moore v. Kayport Package Exp., Inc.,* 885 F.2d 531, 540 (9th Cir.1989) ("A pleading is sufficient under Rule 9(b) if it identifies the circumstances constituting fraud so that a defendant can prepare an adequate answer to the allegations. While statements of the time, place and nature of the alleged fraudulent activities are sufficient, mere conclusory allegations of fraud are insufficient"). See also *Walling v. Beverly Enters.,* 476 F.2d 393, 397 (9th Cir.1973) (concluding that allegations stating the time, place, and nature of allegedly fraudulent activities meet Rule 9(b)'s particularity requirement).

Rule 9(b) "does not require nor make legitimate the pleading of detailed evidentiary matter," however. All that is necessary is "identification of the circumstances constituting fraud so that the defendant can prepare an adequate answer from the allegations." *Walling,* 476 F.2d at 397 (alleging in conclusory fashion that defendant's conduct was fraudulent was not sufficient under Rule 9(b)). See also *Miscellaneous Serv. Workers Local # 427 v. Philco–Ford Corp.,* 661 F.2d 776, 782 (9th Cir.1981) (holding that Rule 9(b) requires a pleader to set forth the "time, place and specific content of the false representations as well as the identities of the parties to the misrepresentation").

### 3. Whether Plaintiffs Lack Standing Under RICO Because They Have Not Sufficiently Alleged Injury and Proximate Cause

#### a. Plaintiffs' Allegations of Injury

■ Defendants contend that plaintiffs lack standing to sue under RICO because (1) they did not suffer a concrete financial loss to their business or property, and (2) because they cannot establish that defendants' alleged misconduct proximately caused their injuries.[71] To prevail, plaintiffs must adduce proof of both elements. *Fireman's Fund Ins. Co. v. Stites,* 258 F.3d 1016, 1021 (9th Cir.2001) (citation omitted). To state a RICO claim, plaintiffs must allege that defendants' violation of § 1962 caused injury to their business or property. See 18 U.S.C. § 1964(c) ("Any person *injured in his business or property by reason of a violation* of section 1962 of this chapter may sue therefor in any appropriate United States district court and shall recover threefold the damages he sustains and the cost of the suit, including a reasonable attorney's fee . . ." (emphasis added)). See also *Stites,* 258

---

**71.** MTD at 7.

F.3d at 1021 (to prevail on a civil RICO claim, a plaintiff must establish "that the defendant engaged in: 1) conduct 2) of an enterprise 3) through a pattern 4) of racketeering activity ... and, in addition, show that the defendant caused injury to his business or property" (citations omitted)). Only a plaintiff that has suffered such injury has standing to sue under RICO. See *Chaset v. Fleer/Skybox Int'l*, 300 F.3d 1083, 1087 (9th Cir.2002) (" '[A] RICO plaintiff only has standing if, and can only recover to the extent that, he has been injured in his business or property by [reason of] the conduct constituting the violation,' " quoting *Holmes v. Securities Investor Protection Corp.*, 503 U.S. 258, 279, 112 S.Ct. 1311, 117 L.Ed.2d 532 (1992) (internal citation and quotation omitted)); *Guerrero v. Gates*, 110 F.Supp.2d 1287, 1292 (C.D.Cal.2000) ("A plaintiff only has standing if, and can only recover to the extent that, he has been injured in his business or property by the conduct constituting the violation," citing *Sedima S.P.R.L. v. Imrex Co., Inc.*, 473 U.S. 479, 496, 105 S.Ct. 3275, 87 L.Ed.2d 346 (1985)); *Walker v. Gates*, No. CV 01–10904 GAF (PJWx), 2002 WL 1065618, *7–8 (C.D.Cal. May 28, 2002) (noting that the injury to business or property requirement is a question of standing).[72]

"Financial losses, in and of themselves, are insufficient to confer standing under RICO." *Living Designs, Inc. v. E.I. Dupont de Nemours and Co.*, 431 F.3d 353, 364 (9th Cir.2005). "RICO does not provide a cause of action for all types of injury to property interests, but only for injuries resulting in 'concrete financial loss.' "

*Diaz v. Gates*, 420 F.3d 897, 898 (9th Cir. 2005) (en banc) (quoting *Oscar v. University Students Co-operative Ass'n*, 965 F.2d 783, 785 (9th Cir.1992) (en banc)). "Without a harm to a specific business or property interest—a categorical inquiry typically determined by reference to state law—there is no injury to business or property within the meaning of RICO." *Diaz*, 420 F.3d at 900.

██ Defendants contend that because the benefit plans in question were unfunded, plaintiffs' interest in them "was a mere expectancy interest, not a guaranteed, concrete sum." [73] Defendants characterize the plans as constituting a "chance to obtain deferred compensation—a chance that would materialize only if Opus West had sufficient general assets to pay such compensation." [74] As any payout from the benefit plans would only have occurred if Opus West continued to remain solvent, they assert, that contingency defeats any allegation that plaintiffs suffered a "concrete financial loss."

Examining whether plaintiffs suffered "concrete financial injury" begins with the principle enunciated in *Diaz* that RICO standing must be based on "a harm to a specific business or property interest." 420 F.3d at 900. By agreeing to receive deferred compensation through Opus West's top hat plans, plaintiffs made their right to receive the compensation dependent on the company's ongoing success. The parties agree that the top hat plans provide only for the payment of deferred compensation only from the company's

---

**72.** Consequently, personal injuries are not compensable under RICO. *Oscar v. Univ. Students Co-operative Ass'n.*, 965 F.2d 783, 785 (9th Cir.) (en banc), cert. denied, 506 U.S. 1020, 113 S.Ct. 655, 656, 121 L.Ed.2d 581 (1992).

**73.** MTD at 15. In contrast to the ERISA preemption issue discussed above, the RICO claim is based both on the ERISA-governed top hat plans and on the benefit plans not covered by ERISA.

**74.** *Id.* at 15–16.

general assets. Under the plans, plaintiffs assume the risk that if Opus West suffered financial setbacks or became insolvent, their deferred compensation would be significantly reduced or eliminated. Plaintiffs identify no cognizable property interest in the company's general assets that would confer RICO standing. While under the terms of the deferred compensation agreements, plaintiffs are unsecured creditors of Opus West to the extent of the deferred compensation benefits they claim, this does not give them a property interest in the company's general assets.[75] The most it does is convey a general interest in the company's estate. See *In re The Colonial BancGroup, Inc.*, 436 B.R. 695, 707 n. 17 (Bankr.M.D.Ala.2010) (holding that executives participating in an unfunded top hat plan "ha[d] no ownership interest in the[ ] funds that could be forfeited.... The funds remain part of the general assets of the corporation subject to the claims of its general creditors"). See also *In re Downey Regional Medical Center–Hosp., Inc.*, 441 B.R. 120, 130 (9th Cir.BAP2010) (holding that funds deposited with ING were property of the bankruptcy estate because "[t]he ING account was held in [the debtor hospital's] name and the plan documents plainly provided that compensation deferred under the plan would remain part of [the hospital's] unrestricted assets and would not be held in trust. The plan was unfunded and [the hospital's] obligations were purely contractual in nature. The participation agreement that [the doctor] executed similarly acknowledged that any contributions to the ING account remained the sole property of [the company]. Based on these undisputed facts, the bankruptcy court correctly determined that [the doc-

tor] held no interest in the ING account funds").

As a consequence, courts in other contexts have held that such an interest is insufficient to confer standing. Cf. *United States v. Reckmeyer*, 836 F.2d 200, 205 (4th Cir.1987) (stating in a forfeiture action, that "[u]nlike secured creditors, general creditors cannot point to any one specific asset and claim that they are entitled to payment of the value of that specific asset. General creditors instead enjoy a legal interest in the entire estate of the debtor," and concluding as a result that the creditors lacked standing to challenge the forfeiture of a defendant's assets); *United States v. All Assets Held at Bank Julius Baer & Co., Ltd.*, 772 F.Supp.2d 191, 199 (D.D.C.2011) ("While a variety of types of property interests in defendant assets thus may confer standing upon a claimant, '[t]he federal courts have consistently held that unsecured creditors do not have standing to challenge the civil forfeiture of their debtors' property,'" quoting *United States v. One–Sixth Share*, 326 F.3d 36, 41 (1st Cir.2003) (citing in turn *United States v. $20,193.39*, 16 F.3d 344, 346 (9th Cir.1994))); *United States v. Jaynes*, No. 5:06–CR–54–BR, 2009 WL 129969, *3 (W.D.N.C. Jan. 20, 2009) ("An unsecured creditor normally can only show that its interest lies in the debtor's estate, rather than in the specific property covered by the forfeiture order"); *United States v. BCCI Holdings (Luxembourg), S.A.*, No. CRIM. 91–0655(JHG), 1994 WL 914459, *3 (D.D.C. Oct. 28, 1994) (noting, in discussing standing under the penalty provisions of the criminal RICO statute, 18 U.S.C. §§ 1963(1)-(2), that "[a]s recognized

**75.** MTD at 1; see also RJN, Exh. A at 6, § 4.2 (A Participant's SARs are unsecured obligations of the Company to pay the Participant ..."); *id.*, Exh. B at § 5.5 ("A Participant's credits in his or her Account shall be an

unsecured obligation of the respective Company.... Each Participant or Beneficiary is only a general creditor of the Company ..."); *id.*, Exh. C (same); Exh. D at 5, § 5.2 (same); Exh. E at 3, § 3.4 (same).

by this Court and most, if not all, other courts addressing the issue, an unsecured creditor does not possess an interest in any specific asset of a debtor and merely has a general interest in the debtor's entire estate"). These cases are persuasively applied to the RICO standing inquiry, especially given the *Diaz* court's mandate that a RICO plaintiff identify a "specific business or property interest." *Diaz*, 420 F.3d at 900 ("Without a harm to a specific business or property interest . . . there is no injury to business or property within the meaning of RICO").

This conclusion is reinforced when one considers that if an unsecured, inchoate interest in the "entire estate" of a debtor conferred RICO standing, the court would be placed in the position of determining what property of the debtor plaintiffs are entitled to recover. In their Prayer for Relief, plaintiffs seek "all monies converted by the Defendants with interest thereon," as well as an injunction preventing defendants from transferring, conveying, or otherwise disposing of "any of the property embezzled." [76] Because plaintiffs can recover only property in which they have a cognizable legal interest, and because they are admittedly unsecured creditors, they cannot to identify any specific asset or property to which they could lay a claim. Consequently, it would be difficult for plaintiffs to claim that any of their property was actually converted or embezzled, since they had no entitlement to, and no ownership rights in, the property in question. Cf. *In re Downey Regional Medical Center–Hosp., Inc.*, 441 B.R. at 131 (noting that "structure and purpose of unfunded top hat plans (income tax deferral) which depend on the deferred compensation remaining subject to the claims of unsecured creditors" and that plan before the court "specifically provided that the participants had no ownership interest in the funds. As a result, removing the plan funds from the estate would not establish ownership in the participants").

In *Chaset*, the Ninth Circuit held that a "mere expectancy interest" was insufficient to confer RICO standing. 300 F.3d at 1087. *Chaset* addressed whether purchasers of trading cards had suffered a RICO injury because they allegedly purchased packs of trading cards with the hope that the packs would contain more valuable "insert" cards in addition to the "base" cards that typically were included in each pack. *Id.* at 1085–86. The trading card packs usually stated the odds that a particular insert card would be included in the pack, and also typically contained disclaimers that insert cards were not guaranteed with each pack. *Id.* The Ninth Circuit followed the Fifth Circuit and a New York district court in holding that plaintiffs had failed to state a RICO injury. It said:

> "At the time the plaintiffs purchased the package of cards, which is the time the value of the package should be determined, they received value—eight or ten cards, one of which might be an insert card—for what they paid as a purchase price. Their disappointment upon not finding an insert card in the package is not an injury to property." *Id.* at 1087.

Although plaintiffs' claim is different, there is one striking parallel between this case and *Chaset*. There, the outcome was driven by the fact that, in purchasing a set of trading cards, plaintiffs gambled that when they opened their pack, it would contain the cards they desired. The fact that the pack might not include such a card, and that they would be disappointed, was a feature of the bargain they struck.

---

**76.** FAC at 36–37.

Similarly, in entering into the executive incentive compensation agreements, plaintiffs assumed the risk that they might eventually not be paid. They received a clear benefit from having the agreements structured in this way; money paid into the plans was not subject to tax liability and was not drawn directly from their income. See *Carr v. First Nationwide Bank,* 816 F.Supp. 1476 (N.D.Cal.1993) ("Like the Savings and Loan's Plan, the plan in Barrowclough allowed certain executives to reduce their tax liability by deferring income which would be credited to them in an account, would accumulate interest, and would eventually be repaid to them by the plan sponsor at retirement, termination or otherwise"); *In re IT Group, Inc.,* 305 B.R. 402, 409 (Bankr. D.Del.2004) ("The lack of compensation in the given period is precisely what provides the tax benefit for the participant. By deferring payment of compensation, the tax liability for that deferred amount is also deferred. This benefit is not without risk, however, because to qualify for such treatment, the deferred amount must be subject to general unsecured creditors' claims"); see also *Resolution Trust Corp. v. MacKenzie,* 60 F.3d 972, 977 (2d Cir. 1995) ("Therefore, we hold that, at all times relevant to this case the Plan assets remained the property of Columbia, subject to the claims of its creditors. MacKenzie and Timms are merely two such creditors"); cf. *Minor v. United States,* 772 F.2d 1472, 1475 (9th Cir.1985) ("Unfunded plans do not confer a present tax-

able economic benefit"). The disadvantage of participating in such a plan is precisely that which plaintiffs have experienced—because they have no secured interest in any of the monies in the plan, and because they have no control over or cognizable property interest in them, when the company became insolvent they were restricted to the amount they could recover as unsecured creditors from the bankruptcy estate.[77] Cf. *Summerfield v. Strategic Lending Corp.,* No. C09–02609 HRL, 2010 WL 3743897, *4 (N.D.Cal. Sept. 20, 2010) ("[U]nder basic principles of trust law, since the trust is revocable, Ed's interest in it is, at least up to this point in time, . . . " 'merely potential' and could 'evaporate in a moment at the whim of the [trustor],' " " quoting *Steinhart v. County of Los Angeles,* 47 Cal.4th 1298, 1319–20, 104 Cal. Rptr.3d 195, 223 P.3d 57 (2010) (in turn quoting *Johnson v. Kotyck,* 76 Cal.App.4th 83, 88, 90, 90 Cal.Rptr.2d 99 (1999))); *id.* ("With no present interest in the funds contained in the trust, Ed cannot claim that he suffered injury to his 'business or property,' and so he does not have standing under RICO").

To show that they have standing, plaintiffs cite their allegation that their deferred compensation has variously been categorized as "vested" or "unvested," as well as their allegation that defendants took "money, funds and credits" owed to plaintiffs in violation of ERISA.[78] Plaintiffs cite no authority for the proposition

---

**77.** Defendants also rely on *Impress Communications v. Unumprovident Corp.,* 335 F.Supp.2d 1053, 1064 (C.D.Cal.2003), which held that "that RICO does not provide a remedy for allegedly inferior quality of insurance benefits, where no benefits were ever sought." The *Impress Communications* court relied heavily on the Ninth Circuit's decision in *Oscar v. Univ. Students Coop. Ass'n,* 965 F.2d 783, 785 (9th Cir.1992) (en banc). *Diaz,* also an en banc decision, calls *Oscar* into serious

question. See *Newcal Industries, Inc. v. Ikon Office Solution,* 513 F.3d 1038, 1055 (9th Cir.2008) (stating that *Diaz* "had overturned" the rules applied in *Oscar,* and remanding so that district court could consider the effect of *Diaz* on its prior conclusion that plaintiffs lacked RICO standing).

**78.** Opp. at 11–12 (citing to FAC, ¶ 34(a)-(p)).

that the designation of the compensation as vested changed the terms of the agreements or conferred any property right on them, and it appears to be incorrect.[79] See *In re The Colonial BancGroup, Inc.*, 436 B.R. at 707 n. 19 (noting that there is a difference between "funded" and "vested," and holding that the fact participants had a "vested balance" in a top hat plan did not create "an interest in a particular set of funds" because the top hat plan was, by definition, unfunded). The allegation that defendants took "money, funds and credits" is merely a legal conclusion framed as a statement of fact. The only cases plaintiffs cite are *United States v. Grizzle*, 933 F.2d 943 (11th Cir.1991), and *Mendoza v. Zirkle Fruit Co.*, 301 F.3d 1163 (9th Cir. 2002). These cases do not support plaintiffs' claim that they have standing. *Grizzle* dealt with whether "employee contributions to benefit plans which *are withheld from employees' paychecks* by employers though not yet delivered to the benefit plan" could serve as the basis of an embezzlement conviction under 18 U.S.C. § 664. *Grizzle*, 933 F.2d at 946 (emphasis added). Because the contributions were directly taken from the property of the individual employees (i.e., from wages to which they were entitled, the fact that the funds had not yet been transferred to the pension fund was immaterial. *Id.* If plaintiffs' compensation funds had been structured in that manner, they would be able to demonstrate a cognizable interest in the funds sufficient to support RICO standing.

Plaintiffs also cite *Mendoza* for the proposition that "employment-related claims may be the basis for a RICO claim." [80] The court has no quarrel with that somewhat broad proposition; at issue, however, is whether *this particular employment-related claim* alleges RICO injury. In *Mendoza*, a group of agricultural laborers who were legally authorized to work in the United States filed suit against

---

**79.** The complaint does not clearly delineate which plans were covered by ERISA and which were not. Paragraph 34 of the complaint alleges that various plaintiffs were owed various amounts of money under a series of different plans; the pleading does not allege which plans were ERISA plans and which were not, however. (FAC, ¶ 34.) Paragraphs 116–122 set forth plaintiffs' ERISA claim, but state only that defendants "established certain top hat plans for Plaintiffs which are classified as ERISA plans." The claim specifically identifies the Opus 80/20 officer and non-officer deferred compensation plans, as well as the "Presidents Deferred Plan." (*Id.*, ¶ 117.) Plaintiffs contend that defendants "have played a shell game with the names of the plans" and request that they not be held accountable for failing to name the proper plans if the names have changed or are "slightly different." (*Id.*)

While defendants proffered copies of five plans they contend are covered by ERISA— namely, the SAR Plan, the Opus 80/20 Plan for Officers, the Opus Deferred Compensation Plan for Operating Subsidiaries, the Opus West Corporation Incentive Compensation Plan, and the Opus West Corporation Incentive Compensation Plan for John W. Greer— see RJN, Exhs. A–E, neither party submitted copies of benefits plans not covered by ERISA.

Defendants contend the non-ERISA plans are unfunded and that plaintiffs have a mere expectancy interest in them. (Reply at 7–8.) Plaintiffs respond that "the FAC makes clear that [unspecified] plaintiffs are *currently* owed compensation in addition to 'deferred compensation,'" see Opp. at 12 (citing paragraph 34 of the complaint (emphasis added)). That paragraph, however, does not clearly allege such a fact; it merely states the legal conclusion that plaintiffs are "owed" certain monies, lists various amounts due various plaintiffs under different plans, which the complaint acknowledges may be misnamed. (FAC, ¶¶ 34.117.)

At oral argument, counsel for both parties conceded that all benefits owed under the plans, whether or not overed by ERISA, are unfunded plans. The court relies on this concession in conducting its analysis.

**80.** Opp. at 11.

two fruit orchard operators, contending that defendants were engaged in a scheme to hire undocumented workers "for the purpose of depressing employee wages below the levels they would otherwise be required to pay." *Mendoza,* 301 F.3d at 1166. The injury plaintiffs had suffered was "lost wages." *Id.* at 1168. A claim to wages is a "business or property interest" of sufficient concreteness as compared with the undefined, theoretical, and future interest plaintiffs claim here. Cf. *O'Neil v. Peak,* No. C08–1041–JCC, 2010 WL 55865, *4 (W.D.Wash. Jan. 5, 2010) ("Thus, a plaintiff may not merely make a conclusory statement about business and property injuries. Rather, these cases show that in order to achieve RICO standing, a plaintiff must show not merely that going to work was dangerous or distressing, but that it was impossible"); *Sound Appraisal v. Wells Fargo Bank, N.A.,* No. C 09–01630 CW, 2009 WL 3353057 (N.D.Cal. Oct. 15, 2009) ("It does not protect a plaintiff's hypothetical economic relationship 'with the entire market of all possible but as yet unidentified buyers' or customers. Here, Plaintiffs have only alleged unspecified relationships with unnamed parties for unspecified future potential business"); *Camarillo v. City of Maywood,* No. CV 07–3469 ODW (SHx), 2008 WL 4056994, *2 (C.D.Cal. Aug. 27, 2008) ("Plaintiff's allegations merely recite what may be considered a property interest under RICO and are insufficient by themselves to state an injury thereunder," citing *Twombly,* 127 S.Ct. at 1965 ("[A] formulaic recitation of the elements of a cause of action will not do")).

For all of the reasons stated, the court concludes that plaintiffs have failed to allege the existence of an injury to their "business or property" sufficient to confer RICO standing.

### b. Whether Plaintiffs Have Sufficiently Alleged Proximate Cause

Defendants also contend that plaintiffs have not adequately alleged the causation element of RICO injury. The Supreme Court has held that a showing of mere but-for causation will not support recovery under § 1964(c); a plaintiff must demonstrate proximate causation as well. *Mendoza,* 301 F.3d at 1168 ("The key task is to determine whether this injury was 'by reason of the growers' alleged violations, a requirement the Supreme Court has interpreted to encompass proximate as well as factual causation"); see *Holmes,* 503 U.S. at 265–66, 112 S.Ct. 1311 (the RICO statute "can, of course, be read to mean that a plaintiff is injured 'by reason of a RICO violation, and therefore may recover, simply on showing that the defendant violated § 1962, the plaintiff was injured, and the defendant's violation was a 'but for' cause of plaintiff's injury. This construction is hardly compelled, however, and the very unlikelihood that Congress meant to allow all factually injured plaintiffs to recover persuades us that RICO should not get such an expansive reading" (citation and footnotes omitted)). See also *Imagineering, Inc. v. Kiewit Pacific Co.,* 976 F.2d 1303, 1311 (9th Cir.1992) ("In order to maintain a cause of action under RICO then, the plaintiff must show not only that the defendant's violation was a 'but for' cause of his injury, but that it was the proximate cause as well" (citation omitted)), cert. denied, 507 U.S. 1004, 113 S.Ct. 1644, 123 L.Ed.2d 266 (1993); accord *Chaset,* 300 F.3d at 1086–87; *Oki Semiconductor Co. v. Wells Fargo Bank, Nat'l Ass'n,* 298 F.3d 768, 773 (9th Cir.2002); *Resolution Trust Corp. v. Keating,* 186 F.3d 1110, 1117 (9th Cir.1999).

A proximate cause of injury is " 'a substantial factor in the sequence of responsi-

ble causation.'" *Oki Semiconductor*, 298 F.3d at 773 (quoting *Cox v. Admin. United States Steel & Carnegie*, 17 F.3d 1386, 1399 (11th Cir.1994)). To prove that an injury is proximately caused by a RICO violation, a plaintiff must demonstrate that there is "a direct relationship between the injury asserted and the injurious conduct alleged." *Imagineering*, 976 F.2d at 1311 (citing *Holmes*, 503 U.S. at 268, 112 S.Ct. 1311); see *id.* ("One principle underlying this requirement is that the less direct an injury is, the more difficult it becomes to ascertain the amount of a plaintiff's damages attributable to the violation, as distinct from other, independent factors," citing *Holmes*, 503 U.S. at 269, 112 S.Ct. 1311).

■ In deciding whether a plaintiff has adequately alleged proximate causation, the court focuses on "three nonexhaustive factors ... [which determine] whether the injury is 'too remote' to allow recovery: (1) whether there are more direct victims of the alleged wrongful conduct who can be counted on to vindicate the law as private attorneys general; (2) whether it will be difficult to ascertain the amount of the plaintiffs' damages attributable to defen-

dant's wrongful conduct; and (3) whether the courts will have to adopt complicated rules apportioning damages to obviate the risk of multiple recoveries." *Mendoza*, 301 F.3d at 1169 (citing *Ass'n. of Wash. Pub. Hosp. Dists. v. Philip Morris Inc.*, 241 F.3d 696, 701 (9th Cir.2001)).[81] See also *Pillsbury, Madison & Sutro v. Lerner*, 31 F.3d 924, 928 (9th Cir.1994) ("These three policy concerns guide a court's evaluation of the directness of the injury" (citation omitted)).

Analyzing these factors, the Supreme Court has held that a plaintiff cannot recover under RICO for injuries caused to a third party. See *Holmes*, 503 U.S. at 268–69, 112 S.Ct. 1311 ("[A] plaintiff who complained of harm flowing merely from the misfortunes visited upon a third person by the defendant's acts was generally said to stand at too remote a distance to recover" (citations omitted)). The Ninth Circuit has applied this principle in several cases. See, e.g., *Oki Semiconductor*, 298 F.3d at 774 (holding that theft victims were not directly injured by a money launderer's subsequent activities because "[o]nly after the theft occurred and the semiconductors

**81.** *Mendoza* discussed these factors in analyzing whether RICO plaintiffs had statutory standing to assert their claims. See *Mendoza*, 301 F.3d at 1168–69. Whether denominated "standing" or "causation," however, the question is the same. See *id.* at 1168 ("We turn first to the statutory standing requirements particular to RICO. Under RICO, '[a]ny person injured in his business or property by reason of a violation of section 1962 of this chapter may sue therefor in any appropriate United States district court' for civil damages. 18 U.S.C. § 1964(c).... The employees allege an injury to their property in the form of lost wages. The key task is to determine whether this injury was 'by reason of the growers' alleged violations, a requirement the Supreme Court has interpreted to encompass proximate as well as factual causation"). The *Mendoza* factors mirror concerns first expressed by the Supreme Court in

*Holmes* regarding the need that RICO injury be "direct." See *Holmes*, 503 U.S. at 269–70, 112 S.Ct. 1311 ("First, the less direct an injury is, the more difficult it becomes to ascertain the amount of a plaintiff's damages attributable to the violation, as distinct from other, independent, factors. Second, ... recognizing claims of the indirectly injured would force courts to adopt complicated rules apportioning damages among plaintiffs removed at different levels of injury from the violative acts, to obviate the risk of multiple recoveries. And, finally, the need to grapple with these problems is simply unjustified by the general interest in deterring injurious conduct, since directly injured victims can generally be counted on to vindicate the law as private attorneys general, without any of the problems attendant upon suits by plaintiffs injured more remotely").

were sold could Tran launder the proceeds"); *Welfare Trust Fund v. Philip Morris, Inc.,* 185 F.3d 957, 963–67 (9th Cir.1999) (holding that health care trust funds that paid medical claims could not sue tobacco companies under RICO because their injury was derivative of smokers' injury, and stating: "A direct relationship between the injury and the alleged wrongdoing, although not the 'sole requirement' of RICO ... proximate causation, 'has been one of its central elements'" (citations omitted)); *Pillsbury, Madison & Sutro,* 31 F.3d at 928–29 (holding that a sublessee was not directly injured when RICO violations caused an increase in the rent charged to the primary tenant, although the tenant passed the increases on to the sublessee); *Imagineering,* 976 F.2d at 1311 (holding that a subcontractor was not directly injured when a RICO violation prevented a general contractor that would have retained it from obtaining a construction contract).

Consequently, to state a RICO claim, plaintiffs must plead a direct causal connection between their alleged injuries and defendants' racketeering conduct. Plaintiffs here base their RICO claim on three predicate acts: (1) bank fraud; (2) mail/wire fraud; and (3) embezzlement. The proximate cause analysis for the bank fraud allegations differs from that for the mail/wire fraud and embezzlement allegations.

### i. The Connection Between the Alleged Bank Fraud and Plaintiffs' Injury

Defendants first contend that plaintiffs lack standing to assert a RICO claim based on the bank fraud statutes, 18 U.S.C. §§ 1014 and 1344.[82] They contend that although 18 U.S.C. § 1344 is one of the predicate acts enumerated in the RICO statute, only financial institutions have standing to allege a violation of § 1344 as a predicate act under RICO. See *Soto v. Vanderbilt Mortgage and Finance, Inc.,* CV No. No. C–10–66, 2010 WL 3363657, *12 (S.D.Tex. Aug. 23, 2010) ("Defendants contend that only financial institutions have standing to allege bank fraud under 18 U.S.C. § 1344 as a predicate act for RICO purposes. Although there is no prevailing case law in the Fifth Circuit, courts have consistently found that only financial institutions may claim bank fraud under 18 U.S.C. § 1344 as a predicate act for RICO purposes");; *Herrick v. Liberty League Int'l,* No. 1:07–cv–936, 2008 WL 2230702, *4 (S.D.Ohio May 28, 2008) ("Additionally, Plaintiffs do not have standing to assert bank fraud as a predicate act of RICO liability. Only defrauded financial institutions have standing to assert bank fraud as a RICO predicate"); *Best Deals on TV, Inc. v. Naveed,* No. C 07–1610 SBA, 2007 WL 2825652, *10 (N.D.Cal. Sept. 26, 2007) ("The plaintiffs fail to state a claim for bank fraud. Only financial institutions have standing to allege violations of bank fraud under 18 U.S.C. § 1344 as predicate acts for RICO purposes"). Other district courts have reached similar conclusions. See, e.g., *Starfish Inv. Corp. v. Hansen,* 370 F.Supp.2d 759, 773 (N.D.Ill.2005) ("The financial institution fraud allegation does not help Starfish, however, because only financial institutions have standing to allege violations of the financial institution fraud statute, 18 U.S.C. § 1344, as predicate acts for RICO purposes").

---

82. Defendants correctly note that plaintiffs cannot base their RICO claim on a violation of 18 U.S.C. § 1014, as it is not among the predicate acts enumerated in 18 U.S.C. § 1961(1). Plaintiffs do not dispute this, and state in their opposition that their bank fraud allegation is based on 18 U.S.C. § 1344. (See also FAC, ¶ 97(1).)

■ The bank fraud statute is designed to protect financial institutions and requires as an element the " 'intent to victimize the institution by exposing it to actual or potential loss.' " *United States v. Jacobs*, 117 F.3d 82, 94 (2d Cir.1997) (quoting *United States v. Stavroulakis*, 952 F.2d 686, 694 (2d Cir.1992)); see also *Bressner v. Ambroziak*, 379 F.3d 478, 482 (7th Cir.2004) ("But the bank fraud statute isn't designed to protect Bressner, it is designed to protect banks"). The fact that banks are the intended victims of the bank fraud statute, however, does not categorically mean that plaintiffs who were otherwise injured as a result of bank fraud cannot assert claims under RICO. The relevant statutes are structured so that any predicate offense listed in 18 U.S.C. § 1961(1) can serve as the basis for a civil claim under § 1962(a)-(d), so long as the plaintiff meets the injury and causation requirements delineated in § 1964(c). 18 U.S.C. § 1964(c) ("Any person injured in his business or property by reason of a violation of section 1962 of this chapter may sue therefor in any appropriate United States district court and shall recover threefold the damages he sustains . . ."). The statute does not require that the plaintiff who brings the action be one of the "intended victims" of the criminal statute that serves as the predicate for the civil claim. Rather, so long as a civil plaintiff can demonstrate the existence of racketeering activity, and can prove that he or she sustained injury "by reason of" that activity, the plaintiff can assert a RICO claim. See *Diaz*, 420 F.3d at 901 ("There is similarly no room in the statutory language for an additional, amorphous requirement that, for an injury to be to business or property, the business or property interest have been the 'direct target'

of the predicate act. The statute is broad, but that is the statute we have").

This does not end the inquiry, however. Here, there are more direct victims than plaintiffs who can "be counted on to vindicate the law as private attorneys general." *Mendoza*, 301 F.3d at 1169; see also *id.* at 1169–70 ("[P]otential plaintiffs who have suffered 'passed-on' injury—that is, injury derived from a third party's direct injury—lack statutory standing"). Those more direct victims would be the banks who were the targets of the alleged fraud, and who have a substantial stake in recovering any financial losses they incurred, especially if plaintiffs' allegation that defendants' conduct "[left] the Banks holding millions in unpaid loans" is true.[83] Indeed, it is this reality that may have led other courts to hold that only banks can assert a RICO claim based on predicate acts of bank fraud. See, e.g., *Edmonds v. Seavey*, No. 08 Civ. 5646(HB), 2009 WL 2949757, *6 n. 8 (S.D.N.Y. Sept. 15, 2009) ("[Section] 1344 only prohibits 'a scheme or artifice . . . to defraud a financial institution,' and a RICO plaintiff who is not a financial institution under the statute lacks standing or injury to bring a RICO claim based on bank fraud as the predicate act," quoting *Hilgeford v. Nat'l Union Fire Ins. Co. of Pittsburgh*, No. 3:08–CV–669, 2009 WL 302161,*6 (E.D.Va. Feb. 6, 2009)). The presence of a more direct victim thus weighs strongly against a finding that plaintiffs can assert a RICO claim based on bank fraud.

Plaintiffs' bank fraud allegations also fail adequately to plead causation due to the uncertainty inherent in determining damages attributable to the wrongful conduct. *Mendoza*, 301 F.3d at 1169. Plaintiffs contend that defendants' alleged bank fraud permitted Opus West to appear to be complying with its loan covenants, and thus to

---

83. FAC, ¶ 97 at 27.

shield itself from a thorough investigation of its finances.[84] They assert that, as a result, Opus Corp. "was not forced to . . . infuse more equity [into] the company, thus lowering [its] risk profile and even worse, [that Opus West] was allowed to borrow additional money based on these false statements of covenant compliance."[85] Plaintiffs also contend that defendants made a false statement to a federally insured institution to prevent that institution from placing Opus West in default.[86]

These allegations do not plead a direct chain of causation between the allegedly illegal conduct (deceiving banks) and plaintiffs' alleged injury (the deprivation of their benefits). To conclude that the injury was proximately caused by the bank fraud, the court would have to pile inference on inference. Beyond general allegations that the banks would have forced Opus Corp. to inject capital into Opus West, the complaint does not state what actions the financial institutions would have taken had they known of the fraud, or how those actions would have prevented Opus West from experiencing the financial difficulties that led to its bankruptcy. Because of these gaps, the complaint does not adequately plead that plaintiffs' purported injury was proximately caused by defendants' alleged bank fraud. Consequently, as two substantial factors in the *Holmes/Mendoza* analysis weigh against a finding that causation is properly pled, the court concludes that plaintiffs lack statutory standing to assert RICO claims based on defendants' alleged bank fraud.[87]

### ii. The Connection Between Plaintiffs' Injury and Defendants' Purported Mail/ Wire Fraud and Embezzlement [88]

While plaintiffs' allegations regarding the causal link between their injury and defendants' mail/wire fraud and embezzlement are more plausible, they too suffer from a fatal ambiguity. As noted above, the individuals best situated to assert a RICO claim are "the immediate victims of an alleged RICO violation" who "can be expected to vindicate the laws by pursuing their own claims." *Anza,* 547 U.S. at 460, 126 S.Ct. 1991; *Canyon County v. Syngenta Seeds, Inc.,* 519 F.3d 969, 981 (9th Cir.2008) ("Where the violation is not itself the immediate cause of the plaintiff's injury, proximate cause may be lacking"). Plaintiffs' causation allegations would be significantly strengthened if they could assert that defendants fraudulently transferred money to which they had a specific right. As their compensation was unfunded and was to be paid from Opus West's general assets, however, they can-

---

84. *Id.,* ¶ 96 at 26–27.

85. *Id.,* at 27.

86. *Id.*

87. The third factor in the analysis, the risk of multiple recovery, "is not a necessary condition for concluding that proximate cause is lacking." *Sybersound Records, Inc. v. UAV Corp.,* 517 F.3d 1137, 1149 (9th Cir.2008); see also *Anza v. Ideal Steel Supply Corp.,* 547 U.S. 451, 459, 126 S.Ct. 1991, 164 L.Ed.2d 720 (2006) ("Notwithstanding the lack of any appreciable risk of duplicative recoveries, which is another consideration relevant to the proximate-cause inquiry, these concerns help to illustrate why Ideal's alleged injury was not the direct result of a RICO violation"). Plaintiffs note that any amount they obtain through the bankruptcy proceedings can be offset against any recovery on their RICO claim. (Opp. at 14–15.) While defendants do not dispute this, that alone is insufficient to confer standing given the other factors that weigh against such a finding.

88. To the extent plaintiffs seek to recover the compensation they were owed under the ERISA-covered plans, they may assert a RICO violation. As defendants note, however, embezzling benefits under plans not covered by ERISA cannot serve as a RICO predicate act.

not make such a claim. Plaintiffs attempt to cure this problem by alleging that "[w]hen Defendants wired the money out of Opus West Corporation and then to the Trusts, [they] embezzled, stole, or unlawfully and willfully abstracted and converted . . . moneys, funds, premiums, credits, property, or other assets of Plaintiffs' employee pension benefit plan." [89] They also assert that "each transfer of funds from Opus West to [d]efendants took an amount that was pro-rated between the percentage the pension fund obligations bore to the liabilities of Opus West at the time of the embezzlement." [90] Such statements are legal conclusions cast as factual allegations, and do not pass muster under Rule 9(b)'s requirement that alleged fraud be pled with particularity. See *Pareto v. FDIC,* 139 F.3d 696, 699 (9th Cir.1998) ("Conclusory allegations of law and unwarranted inferences are not sufficient to defeat a motion to dismiss"); *Molina v. Union Independiente Autentica De La AAA,* 555 F.Supp.2d 284, 295–96 (D.P.R.2008) ("Thus, '[a]s in any other fraud case, the pleader is required to go beyond a showing of fraud and state the time, place and content of the alleged mail and wire communications perpetrating that fraud,'" quoting *Feinstein v. Resolution Trust Corp.,* 942 F.2d 34, 42 (1st Cir.1991)); *Eaves v. Designs for Finance, Inc.,* 785 F.Supp.2d 229, 264 (S.D.N.Y.2011) ("Fur-

ther, although Plaintiffs claim that the pattern of racketeering activity also included violations of 18 U.S.C. § 664, they do not say what conduct might constitute a violation of that statute, and the facts they allege elsewhere in the Second Amended Complaint do not support the notion that anybody stole from the BETA Plan. A passing reference to Section 664, devoid of factual support, does not pass muster under Rule 8's pleading standards or Rule 9(b).").

Without allegations that specific funds to which they had a right were transferred, what remains are allegations that defendants' conduct contributed to Opus West's collapse, which in turn resulted in the deprivation of plaintiffs' benefits.[91] The complaint itself supports this interpretation, stating that "[Opus West] was left severely undercapitalized and highly leveraged and thus destined to fail especially in a declining economy. . . . All these acts interfered with the Plaintiffs' deferred compensation contracts." [92] Notably, plaintiffs are not suing *Opus West.* Nor could they, since any such claims would have to be asserted in the company's bankruptcy proceeding. Nor are they suing as employees of Opus West, alleging that they were deprived of their ability to earn an income as a result of the company's collapse. Instead, they are suing to recover losses under "top hat"

---

89. FAC, ¶ 101.

90. *Id.,* ¶ 96.

91. Plaintiffs' cite *United States v. Carson,* 52 F.3d 1173, 1190 (2d Cir.1995), for the proposition that "[t]op-hat pension plans are not funded separately from the union treasury; consequently, any act that hurt the union hurt the pension fund." A closer examination of the case reveals, however, that defendant's RICO violations there constituted a breach of his fiduciary duty to the union and to the pension fund, and that the pension fund properly forfeited his benefits under the top hat

plan as a result. *Id.* at 1189. Given the factual distinctions, *Carson* does not support the proposition that alleging a defendant generally injured a company that sponsored a top hat suffices to plead causation under RICO. Indeed, it does not appear that standing or causation were at issue in *Carson.*

92. FAC, ¶ 96 at 28. See also *id.,* ¶ 50 ("At all times mentioned herein, Defendants used Opus West as their personal ATM. . . . These actions made Opus West undercapitalized from 2006 through the date of the Opus West bankruptcy filing on July 6, 2009").

compensation plans that clearly relegate them to the status of unsecured creditors.[93]

As a result, their injuries are necessarily predicated on injury to the corporation, which is the more direct victim of the defendants' conduct. As defendants correctly note, Opus West's estate has assumed responsibility for pursuing the claims of unsecured creditors, meaning that a vehicle already exists to vindicate plaintiffs' rights. See *Hamid v. Price Waterhouse*, 51 F.3d 1411, 1420 (9th Cir.1995) ("When a creditor suffers injury that is 'independent of the firm's fate,' his injury is direct and he may pursue his own remedy; otherwise the injury is derivative and the creditor must take his 'place in line' as a creditor in the bankruptcy action"); see also *In re Sunrise Sec. Litig.*, 916 F.2d 874, 887 (3d Cir.1990) ("[P]ermitting depositors to bring individual actions for such injuries [ ] would invariably impair the rights of other general creditors and claimants with superior interests"); *Dana Molded Products, Inc. v. Brodner*, 58 B.R. 576, 580 (N.D.Ill.1986) ("The court's holding accords with many cases holding at common law that creditors may not maintain an action against corporate fiduciaries where the creditor is harmed only indirectly, and has sustained an injury in common with other creditors").[94]

In addition, as with the bank fraud allegations, ascertaining the amount of damages attributable to defendants' conduct would be difficult. Plaintiffs assert that "the second element is satisfied, because the amount of [their] damages are ascertainable," citing allegations that describe the amounts they were owed under various plans prior to the company's insolvency.[95] These allegations merely state the amounts plaintiffs claim as damages; they do not state how the losses are "attributable to defendant's wrongful conduct" as the Ninth Circuit requires. *Mendoza*, 301 F.3d at 1169. Because plaintiffs cannot allege that defendants took money they were actually owed, their claims are tied to Opus West's collapse. Plaintiffs do not directly tie the collapse to the allegedly fraudulent conduct, beyond a general allegation that Opus West's undercapitalization in a difficult economy "destined" it for failure. Indeed, the complaint admits that

---

**93.** The court incorporates here its discussion in note 77, *supra*, of the fact that the complaint does not allege a current entitlement to monies under non-ERISA plans. Given plaintiffs' failure to distinguish between monies they seek under the "top hat" plans and monies they seek under other benefit programs, the court cannot conclude that plaintiffs' interest in those benefit programs is different than their interest in the "top hat" plans. Indeed, plaintiffs' counsel confirmed at the hearing that all of the benefit programs alleged in the complaint were unfunded programs.

**94.** The bankruptcy court determined that the RICO claim was not property of Opus West's estate. (Reply at 11.) Whatever the basis for this decision, it does not preclude an inquiry under *Mendoza/Holmes* into whether the wrongs plaintiffs seek to vindicate by asserting a RICO claim could be pursued by parties who were injured more directly.

The court acknowledges that the Ninth Circuit has previously held a creditor lacked standing to raise RICO claims because she had "not sought an abandonment of the estate's RICO claims, either below or on appeal." *Estate of Spirtos v. One San Bernardino County Superior Court Case Numbered SPR 02211*, 443 F.3d 1172, 1176 (9th Cir.2006); see also *id.* ("[A] creditor of the estate who did not receive authorization to sue from the trustee, lacks standing to assert a RICO claim on behalf of the estate."). This holding, however, does not support the converse, i.e., that when a bankruptcy estate disavows its interest in pursuing a RICO claim, an unsecured creditor *necessarily* has standing to sue under the statute.

**95.** FAC, ¶ 34(a)-(p).

the "declining economy"[96] contributed to the company's failure, further undermining any suggestion that plaintiffs lost their benefits as a direct and proximate cause of defendants' conduct.

Consequently, applying the *Mendoza/Holmes* factors, the court concludes that plaintiffs have failed to allege that their injuries were proximately cause by defendants' wrongful conduct.

### 4. Whether Plaintiffs Have Alleged RICO "Conduct" or "Participation"

As a further basis supporting dismissal of plaintiffs' RICO claims, the court notes that their pleading of defendants' "conduct" and "participation" is defective. As defendants correctly observe, plaintiffs use collective pleading to allege RICO "conduct" or "participation," making repeated references to an unspecified "defendant" or "defendants" who committed the various acts in question. This is particularly true of their mail/wire fraud and embezzlement allegations. (See, e.g., FAC, ¶ 95 (*"Defendant persons* managed, operated and manipulated the enterprise ..."); ¶ 97(1) (*"Defendants* made a ... loan at 33% interest so OWC could pay its dividends"); ¶ 97(2) (*"Defendants* have committed Mail and Wire Fraud on at least the six different occasions when they manipulated the books ..."); ¶ 97(3) (*"Defendants* transferred the funds out of Opus West ...") (emphases added).

Rule 9(b) demands a much greater level of specificity, requiring that plaintiffs plead the "time, place, and manner of each predicate act, the nature of the scheme involved, and the role of each defendant in the scheme." *Lancaster Community Hosp. v. Antelope Valley Hosp. Dist.*, 940 F.2d 397, 405 (9th Cir.1991) ("Federal Rule of Civil Procedure 9(b) re-

quires a pleader of fraud to detail with particularity the time, place, and manner of each act of fraud, plus the role of each defendant in each scheme"); *Kennedy v. Full Tilt Poker*, No. CV 09–07964 MMM (AGRx), 2010 WL 1710006, *4 (C.D.Cal. Apr. 26, 2010) (same). Plaintiffs' vague and unspecified references to "defendants" are not sufficient to place each defendant on notice of the specific allegations being made against them, and does not satisfy Rule 8, much less Rule 9(b). See *Kennedy*, 2010 WL 1710006 at *4 ("Beyond pleading the legal conclusion that each defendant participates in and controls Full Tilt, plaintiffs offer no factual allegations that suggest direct involvement by any defendant in the alleged enterprise."); *Eclectic Properties East, LLC v. Marcus & Millichap Co.*, 2010 WL 384736, *3 (N.D.Cal. Jan. 29, 2010) ("The complaint does not adequately allege facts showing that each defendant conducted the enterprise through a pattern of racketeering activity, in particular lacking facts for the individual broker defendants who are alleged to have been involved in only one transaction, or a couple of transactions within a relatively short amount of time").

Plaintiffs' only response to defendants' argument on this point is the citation of decades-old Seventh Circuit authority. At least pre-*Iqbal/Twombly*, that circuit "set forth a liberal interpretation of Rule 9(b)" that may have permitted the type of pleading plaintiffs offer here. *Swanson v. Wabash, Inc.*, 577 F.Supp. 1308, 1321 (N.D.Ill. 1983). Given the contrary authority discussed above, and the strength of Rule 9(b)'s requirements, the court finds plaintiffs' authorities unpersuasive. Consequently, plaintiffs' RICO allegations fail on this basis as well.

---

**96.** *Id.,* ¶ 97 at 29.

### 5. Plaintiffs' RICO Conspiracy Claim

■ As plaintiffs have failed to allege an underlying RICO violation, their conspiracy claim under 18 U.S.C. § 1962(d) fails. Because plaintiffs have not adequately pled a substantive violation under § 1962(c), they cannot allege a conspiracy to violate RICO. See *Sanford v. MemberWorks, Inc.*, 625 F.3d 550, 559 (9th Cir. 2010) (holding that plaintiffs "cannot claim that a conspiracy to violate RICO existed if they do not adequately plead a substantive violation of RICO"); *Howard v. America Online Inc.*, 208 F.3d 741, 751 (9th Cir.2000) ("To establish a violation of section 1962(d), Plaintiffs must allege either an agreement that is a substantive violation of RICO or that the defendants agreed to commit, or participated in, a violation of two predicate offenses"); *Edmonds*, 2009 WL 2949757 at *7 ("Even more fundamentally, however, where a plaintiff fails to establish a claim for a substantive RICO violation ... any claim for conspiracy to commit that violation must necessarily fail as well"). Consequently, that claim too must be dismissed.

### E. Whether Leave to Amend Should Be Granted

■ Ordinarily a court should grant leave to amend unless it finds that amendment of the claim would be futile. See, e.g., *Kendall v. Visa U.S.A., Inc.*, 518 F.3d 1042, 1051 (9th Cir.2008) ("Dismissal without leave to amend is proper if it is clear that the complaint could not be saved by amendment"); *California ex rel. California Department of Toxic Substances Control v. Neville Chemical Co.*, 358 F.3d 661, 673 (9th Cir.2004) ("[D]enial of leave to amend is appropriate if the amendment would be futile," citing *Foman v. Davis*, 371 U.S. 178, 182, 83 S.Ct. 227, 9 L.Ed.2d

222 (1962)). See *Klamath–Lake Pharmaceutical Ass'n v. Klamath Med. Service Bureau*, 701 F.2d 1276, 1293 (9th Cir.1983) ("[F]utile amendments should not be permitted").

The court's general practice is to grant leave to amend liberally, so long as it appears there is a chance that plaintiffs can successfully state a claim upon which relief can be granted. Leave to amend plaintiffs' state law claims is likely to be futile given the court's reasoning and conclusion regarding the comprehensive nature of ERISA preemption. Plaintiffs' RICO allegations are similarly defective in their pleading of injury and causation, and are not likely to be cured by amendment. Futility of amendment can, "by itself, justify the denial of a motion for leave to amend." *Bonin v. Calderon*, 59 F.3d 815, 845 (9th Cir.1995), cert. denied, 516 U.S. 1051, 116 S.Ct. 718, 133 L.Ed.2d 671 (1996). See also *Eminence Capital, LLC v. Aspeon, Inc.*, 316 F.3d 1048, 1052 (9th Cir.2003) ("Dismissal with prejudice and without leave to amend is not appropriate unless it is clear ... that the complaint could not be saved by amendment").

Even were the court to conclude that plaintiffs might be able to amend the claims being dismissed, however, other considerations warrant a departure from the liberal policy favoring amendment. This litigation is in its last stages. Discovery is now complete. Defendants have filed a motion for summary judgment, which is on calendar for hearing on November 14, 2011.[97] That motion may have the effect of mooting some or all of the claims in any potential amended complaint. The court has also issued a revised scheduling order that sets a pretrial conference for December 12, 2011, and trial for Janu-

---

**97.** Motion for Summary Judgment filed by Defendants, Docket No. 67 (Aug. 29, 2011).

ary 24, 2012.[98] As can be seen, trial is only three months away. Granting plaintiffs leave to amend their complaint would significantly delay the progress of the case, have uncertain effects on the pending motion for summary judgment, and significantly prejudice defendants' ability to prosecute the case.

██ Further, "[t]he district court's discretion to deny leave to amend is particularly broad where plaintiff has previously amended the complaint." *Cafasso, U.S. ex rel. v. General Dynamics C4 Systems, Inc.*, 637 F.3d 1047, 1060 (9th Cir.2011). Plaintiffs sought leave to amend their complaint long after the deadline for the amendment of pleadings had passed to cure earlier defects in their pleadings.[99] Among those defects was the failure to plead an ERISA claim. The amendment was also necessary, plaintiffs asserted, because they wished to add a new defendant.[100] The court granted plaintiffs leave to file a first amended complaint as their application was unopposed and their failure earlier to plead an ERISA claim would have precluded any possibility that they could recover amounts purportedly due under the "top hat" plans.[101] Their failure to allege claims surviving dismissal, even with leave to amend, weighs against permitting further amendment.

Consequently, the court dismisses plaintiffs' claims with prejudice. See *Ascon Properties, Inc. v. Mobil Oil Co.*, 866 F.2d 1149, 1161 (9th Cir.1989) ("Leave need not be granted where the amendment of the complaint would cause the opposing party undue prejudice, is sought in bad faith, constitutes an exercise in futility, or creates undue delay."); *Irise v. Axure Software Solutions, Inc.*, No. CV 08–03601 SJO (JWJx), 2009 WL 3615973, *7 (C.D.Cal. July 30, 2009) ("Allowing Axure the opportunity to inject new claims and defenses into this litigation just two months before trial, would unfairly prejudice iRise, who would be forced at this late hour to consider new lines of legal argument and seek new discovery"); *Veliz v. Cintas Corp.*, No. C 03–1180 RS, 2009 WL 1110414, *1 (N.D.Cal. Apr. 23, 2009) ("The Ninth Circuit has 'often affirmed the denial of leave to amend when the motion was made after the cutoff date for such motions, or when discovery had closed or was about to close,'" quoting *AmerisourceBergen Corp. v. Dialysist W., Inc.*, 465 F.3d 946, 957 (9th Cir.2006)).

## III. CONCLUSION

For the reasons stated, defendants' motion to dismiss plaintiffs' state law claims is granted to the extent they seek to recover benefits owed under the ERISA-covered deferred compensation plans. Defendants' motion to dismiss plaintiffs' RICO claims is also granted. All claims described above are dismissed with prejudice.

---

**98.** Order Continuing Pretrial Conference and Trial, Docket No. 75 (Oct. 12, 2011).

**99.** "Minutes of Motion to Dismiss, Scheduling Conference, Docket No. 25 (Oct. 25, 2010) (setting October 22, 2010 as the deadline for the amendment of pleadings); *Ex Parte* Application to Shorten Time for Hearing, Docket No. 49 (May 31, 2011) (seeking leave to amend to add, *inter alia*, ERISA allegations).

**100.** *Ex Parte* Application at 2–3.

**101.** Order Granting Plaintiffs' Request to File an Amended Complaint; Extending Case Management Schedule, Docket No. 57 (July 5, 2011)